# MILTON H. PINKERTON

## *vs.*

## MINNIE V. SLOCOMB.

*Landlord and tenant: failure to make repairs; injury to tenant; when landlord not liable.*

The mere fact that a landlord fails to perform his contract to make repairs does not render him liable to the tenant, or a member of his family, for personal injuries to them thence ensuing.                                      p. 668

In order to render the landlord liable in such a case, it is necessary to show that such failure to repair was due to his clear act of negligence in failing so to do.                p. 668

Where a landlord employed a competent carpenter to make all necessary repairs to a set of steps, and the carpenter failed to replace a post which had a hidden defect of which the landlord had no notice, the landlord is not liable for injuries to the tenant or a member of his family, occasioned by the defective post.                                      p. 673

Evidence that after the accident the carpenter informed the landlord of the defect, is not admissible for the purpose of showing negligence on the part of the landlord.        p. 673

*Decided November 10th, 1915.*

Appeal from the Court of Common Pleas of Baltimore City. (DAWKINS, J.)

The facts are stated in the opinion of the Court.

The case was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*William Colton,* for the appellant.

*J. Cookman Boyd* (with whom was *Morrill N. Packard* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment obtained by the appellee against the appellant for damages for personal injuries sustained by her, by reason of the alleged defective condition of a stairway leading to the back yard of the premises where she then lived. The case is peculiar in several respects. The declaration alleges that the defendant is owner, individually and as executor of Eleanor Lucinda Pinkerton, deceased, of the leasehold property known as No. 327 East Twenty-fifth street, in Baltimore City, and as such rented the property to the plaintiff. The testimony shows that it was fee simple property, and that although the appellant is the only heir of Mrs. Pinkerton and devisee of the property in question, he had filed a caveat to the will and was administrator *pendente lite* of the estate. The record does not include the will or the caveat, or explain why the latter was filed, but it does show that the appellant verbally rented the property either to the appellee or her husband, or to both. If it was material to determine to whom it was rented, it would be difficult to sustain the allegation in the *narr.* that it was rented to the

appellee, although she and her husband were both present at the time of the renting. But as the liability of a landlord is practically the same to a member of the family of a tenant as to the tenant himself for personal injuries sustained by reason of a defective condition of the premises, we will determine the case regardless of that allegation in the *narr.*

There are twenty-two bills of exception relating to the admissibility of evidence, and another which embraces three prayers of the plaintiff and fifteen offered by the defendant (including some which sought to take the case from the jury), besides a number of special exceptions to the plaintiff's prayers, but under our view of the case it will not be necessary to discuss the exceptions or the prayers in detail. The *narr.* alleges that the defendant agreed to put the property in repair, and keep it in repair, during the tenancy, and the other part of it most material to our discussion is as follows:

> "That said stairway broke and gave way because of the defective condition thereof. That prior to the happening of the injury herein mentioned, this plaintiff had complained to the defendant of the condition of the said stairway and insisted as a condition of the continuance of the tenancy that the same be repaired, and said defendant agreed to make the necessary repairs thereto. That thereafter, but prior to the happening of this accident, the defendant caused certain repairs to be made to said stairway, but the said repairs were improperly, insufficiently and negligently made, and certain defective timbers were permitted to be and remain in said stairway by said defendant. That by reason of the aforesaid attempted repairs this plaintiff was thereby induced to believe in the safety of said stairway and continued as a tenant of the defendant in said property. The said defective condition, though unknown to this plaintiff, was well known to the defendant, and that said injuries to this plaintiff were caused solely by the fault, negligence, want of care and wrongful act of the defendant."

In *Thompson vs. Clemens,* 96 Md. 196, after referring to authorities, we said: "We have no doubt, however, that no action, either in contract or in tort, by a tenant, or one of his family against a landlord to recover damages for personal injuries should be sustained *merely because* the latter has been guilty of a breach of contract to make necessary repairs in the premises demised." Again we there said: "So it seems to us that the correct rule in a case such as the one under consideration is that the mere failure of the landlord to make repairs which he had agreed to make can not make him responsible to the tenant, or a member of his family, for damages for personal injuries sustained by reason of the defective condition of the premises, whether such suit be in *assumpsit* or in case, but in order to recover such damages there must be shown some clear act of negligence or misfeasance on the part of the landlord beyond the mere breach of contract." That opinion concluded by saying: "So, although we are of opinion that a landlord, under contract to repair, may under some circumstances be liable for damages for personal injuries by reason of a *negligent* failure to make repairs, his *negligence* must be clearly established as the foundation for such liability," and we went on to say that there was no such legally sufficient evidence of it as would have justified the Court below in submitting the case to the jury.

We are therefore called upon to examine the evidence, and determine whether it was legally sufficient to authorize the submission of the case to the jury. The appellee and her family had occupied the premises from the middle of August, 1910, to the time of the accident, which she testified happened February 1st, 1913. The appellant rented the house to the husband of the appellee, as the appellant claims, or to both, as their testimony would seem to show, at $40.00 per month, and the appellant was to have a room there and two meals a day, for which he was to allow $6.00 a week. He was in the employ of publishers of city directories, was absent

from Baltimore quite frequently and when there spent the
day away from the house in which he lived.  The appellee
said the house "needed some repairs and Mr. Pinkerton
promised to put it in repair and keep up the repairs for the
consideration of $40.00 per month, and the payments were
to be made as I have stated, and he did some of the repairs
before we moved in and he did the repairs from time to
time as they were needed."  There was a back porch and
eight or nine steps leading down to the yard, with a railing
on each side.  There were posts at the bottom of the rail-
ings.  The appellee testified that on February 1st, 1913,
about seven o'clock in the evening, she started down those
steps "when the fourth step broke at the edge, and it broke
with my foot and when I tried to catch hold of the railing
the railing went off." When asked by the Court, "Do you say
the fourth step? she replied: "Yes, sir, the fourth step from
the bottom, the edge went off that and my foot was on that
and that threw me and I grabbed at the railing and that went
off and I was thrown to the yard on top of that post."

The post itself and pictures of it and the broken stairway
were admitted in evidence against the objection of the defend-
ant, but, although exceptions were taken, we will not stop to
pass on them, and will for the purpose of this discussion
assume the action of the Court in admitting them to have
been proper, as apparently the bottom of the right-hand
post, the one which broke off, was in bad condition at the time
of the accident, although there was nothing on the surface
to indicate it.  The appellee and her husband testified that
sometime during the summer before the accident those steps
were repaired.  Ben S. Johnson, a colored man who did the
repairing, said that he went to that house on August 26th,
1912, and did four days' work, including, during that time,
the repairs on the steps and other work.  In speaking of
those repairs, the appellee said: "The colored man Ben
came and repaired the steps.  To repair the steps he put in
two new bottom steps and to put those in he had to remove
the posts, and of course because of the two steps being off,

and the posts being off, I had to go to the yard through the basement kitchen, while Ben was doing the repairing." She was asked if the post was off, and replied, "Yes, the post had to come off to put in the two new bottom steps, and the posts were put back, and *it looked then in good order.* * * * After Ben had repaired the steps he left and *they looked to be all right.* The posts were put back, and two new steps put there, and I used them until February 1, 1913."

The husband of the appellee said that when they were repaired he was back and forth to and from his work, and was home every evening; that he did not see the men working on them, but he saw the evidence of their having been repaired. A part of his testimony is as follows: "The Court: State when the repairs were made? A. Sometime in the summer previous, I think; I don't know the date. Mr. Colton: After those repairs were made in the summer, if it was in the summer, did you make any further complaints, if any, to Mr. Pinkerton about the condition of the steps? A. Not after they were repaired. Q. There was nothing to indicate there was anything to be done there, was there? A. No, sir; *apparently they were all right.* Q. And the first intimation that you had that they were not all right was when your wife fell, isn't that true? A. Yes. Q. Now, when did your wife fall? A. February 1, 1913."

The defendant said he thought the repairs were made in October; that he had Ben Johnson make the repairs but he was not at home during the day. This appears in his testimony: "Tell his Honor and the gentlemen of the jury whether at that time there was anything to indicate to you that (there) was anything more necessary to be done than was done? A. No, I employed the carpenter and I left it to his judgment. He is a carpenter and built houses and had big contracts if he is a colored man. Q. Was there anything that appeared to you which you saw that was required to be done that was not done? A. No, sir; not at all. Q. At the time of the alleged happening of the accident in this case did you or not know, or was there anything to lead you to

believe, that those steps were out of repair—at that time did
you know or was there anything to lead you to believe it?
A. No." He said he was not there through the day, that he
had confidence in the man, as he was a capable carpenter, and
did not watch his work particularly, that he knew he put in
a couple of new treads and he repaired the steps substantially
for anyone to go up and down, that he went up and down the
steps and the carpenter said he had left them in good condi-
tion.

Johnson testified that he had been a carpenter and in the
suburban contracting business for over twenty-eight years.
He had built churches, dwelling houses, etc., and had worked
for many prominent people about Towson, where he lived.
He said he worked for the appellant's mother for eighteen
years, had built five or six dwelling houses for her, which
cost from six to twelve hundred dollars up to a five thousand
dollar house he built for her. He unquestionably showed
that he was experienced and qualified to do such work as the
appellant employed him to do on these steps, and that is not
denied in the record. In reply to the question what was the
condition of the steps, he said: "Mr. Milton seen me in the
morning. I had to go very soon because he always went away
and he said Ben, I want you to repair these steps and put
treads in them and whatever is needed, and there was only
one bad one but I put on two, the first and the second tread.
The first tread was all right, but the second was a bad one
and that is why I put them in and I had to take off the sec-
ond one to get on the first one without removing the newel
post, and I nailed up all of those steps that had anything
loose about them, and as I considered for a repair job I left
them in perfect condition, those steps. Q. That was August
26, 1912? A. August 26th to August 29th, 1912. Q. Was
there anything that might have been done on those steps that
was not done at that time to repair them? A. No, there was
nothing else." On cross-examination he said Mr. Pinkerton
told him the first day he was there what he wanted done and
he didn't see him any more. This appears in his cross-exam-

ination: "Q. What did you do to those steps? A. Put two
treads on, the first and second. Q. And how did you go
about putting them on? A. The newel post is blocked and
nailed to the carriage and in putting on that first tread we
never tear that newel post off because it will affect it even
if it is sound. Q. And if it is not sound? A. If it is sound.
If we tear the newel post off it will affect it and we cut out
a plug and brace it down between the two posts. There were
two posts to that step and we press it in that way (indicat-
ing) and then there is a nozzle out there like that (indicat-
ing) and we nail that in and that helps to hold the newel
post. We always do that. Mr. Colton: Did you do that on
this occasion? A. Yes, because we have to tear down here
(indicating) by the newel. Mr. Boyd: Did you take down
the second step? A. That didn't interfere, but the first one
hooks to the newel. The first tread hugs the newel post."
He was asked on cross-examination: "When you were there
fixing those steps, didn't you find that an entirely new set of
steps was necessary?," and replied: "No, I didn't. I would
like to put up new steps like all other carpenters, but the
others were sound. They were old looking of course but they
had been painted dozens of times; they were old looking." It
was sought to show that Ben Johnson told Mr. Slocomb and
a young man with him the latter part of February or the
first part of March, 1913, that he thought a whole new set
of steps and posts were necessary and that if he had been
working for himself and not under direct orders he would
have put in a new post. His version of what he said was:
"Mr. Slocomb came out there to see me and pretended that
he wanted to see me about coming in and repairing them
steps at that house and I knowing Mr. Pinkerton not being
there I didn't want to assume any responsibility with any-
body else and I told Mr. Slocomb that that work would have
probably to be all new and I didn't care about doing any-
thing to it unless I seen Mr. Pinkerton and that is about the
way that language came up." That, it will be remembered,
was after the steps and railing had given way.

The appellee called a Mr. Tarr, who said that he was with Mr. Slocomb on the occasion spoken of, and that Johnson did tell Mr. Slocomb that if he had been working for himself and not under direct orders he would have put in a new post. That testimony was objected to and an exception to its admission taken. If it was admissible for any purpose, it was only to contradict Johnson. It certainly cannot be used for the purpose of showing negligence or misconduct on the part of the appellant. It occurred after the accident—six months after Johnson did the work—and he could not bind the appellant by any admissions or statements made at that time. If authority be necessary for that, see *Franklin Bank* v. *Steam Nav. Co.,* 11 G. & J. 28; *Phelps* v. *G. C. & C. R. R. Co.,* 60 Md. 536; and *Noel Con. Co.* v. *Armored Con. Co.,* 120 Md. 237.

There is nothing in the evidence we have referred to, or in any other in the record, which shows any liability on the part of the appellant for negligence or wrongful act. Even if it be conceded that inasmuch as the post was shown to be in bad condition in February, it must have been so the previous August, when the repairs were apparently made (which would not necessarily follow), there is nothing whatever to show that the appellee was aware of it, or that he had any reason to suspect it. The appellee herself testified that the appellant made repairs when needed. If a landlord employs a competent carpenter to do such work, and instructs him to repair some things which he sees need repairing and to do whatever is needed, surely he is not to be held responsible to a tenant, or his family, if the carpenter does not do all he ought to have done, at least unless such defects as existed were visible to the landlord or known by him. The appellee, who spent her days at home while her husband and the appellant were away during the day, had a better opportunity to know the character of work being done on the steps, the condition of the posts, etc., than the appellant had. It is true that for the purposes of this decision we must assume her testimony to be correct—that Johnson did remove the posts,

and that he (although a disinterested witness) was not correct in saying he did not take the posts down. But she could only know that to be so by seeing that the post was down, and hence if she saw it down she had a much better opportunity to know its condition than the appellant had as he did not see it. What we said in *Thompson* v. *Clemens, supra,* on pages 210 and 211, may well be applied here. We there said, in speaking of the condition of the porch then in question: "If there was reason to suppose that the porch was in such a dangerous condition as to call upon the appellee to take immediate action, why did not the plaintiff and her husband know it? If she did know its condition, and notwithstanding such knowledge used it without any more necessity for doing so than is disclosed by this record, then unquestionably she would have been precluded from recovery on the ground of contributory negligence. But as she and her husband disclaim all knowledge of the defect that caused the injury, why should the landlord have imputed to him such knowledge as would justify a Court in declaring him guilty of negligence for not sending a carpenter there at once to repair it? It will not do to say that as he had agreed to make necessary repairs and had had the defective condition of the other end of the porch called to his attention, which he had promised to have repaired the next day, a duty rested on him to have it repaired, and having violated that duty, *therefore* he is responsible. That would be equivalent to saying that he was liable for such damages as are sought to be recovered in this case simply because he had violated his contract, which we have said was not sufficient. There is no reason for holding landlords to such a harsh rule of law as that."

It cannot be fairly inferred from any evidence in the record that the defective condition of the stairway or any part thereof, after the repairs in 1912, was known to the appellant, and there is an utter failure of proof of the allegation in the *narr.* to that effect. It is not pretended that the condition of the fourth step, the breaking of the edge of which caused the appellee to fall against the railing, and hence may

be said to be primarily the cause of the accident, was not as apparent to her and her husband as to the appellant, but he admits that they did not make any complaint of the condition of the steps after they were repaired. If the plaintiff or her husband had any reason to suspect that Johnson had not done his work properly, or had not done all he ought to have done, simple justice to themselves and to the appellant required them to inform the appellant. Indeed as she alleges in the *narr.* that she was tenant, and was in fact occupying the premises with her husband, she might at least have given some attention to the work, in the absence of her husband and the appellant during working hours. Why should we impute to the appellant such knowledge of the condition of the stairway as would justify a Court in declaring him guilty of negligence or any wrongful act, in not having the post removed or further repaired, when the appellee, who was there more than the appellant, and her husband, who was there at least as much as he, disclaim all knowledge of any defect?

So without discussing the various exceptions, we are of the opinion that the case should not have been submitted to the jury, and, as there can be no recovery, we will reverse the judgment without awarding a new trial.

*Judgment reversed, without awarding a new trial, the appellee to pay the costs.*