Argued January 16; reversed March 10, 1931

TEEL *v.* A. B. STEINBACH ESTATE ᴇᴛ ᴀʟ.
(296 P. 1069)

*R. C. Nelson* and *B. E. Haney*, both of Portland
(Joseph, Haney & Veatch and James P. Powers, all of
Portland, on the brief) for appellants.

*J. O. Stearns, Jr.,* of Portland (S. J. Graham and
K. M. Graham, both of Portland, on the brief) for
respondent.

CAMPBELL, J. This is an action for personal injuries. Plaintiff alleges, in effect, that she rented a house from the defendants, at a month to month rental. Before renting she observed that the stairway leading from the first floor to the basement was in need of repair. She called defendants' attention to this fact through their agents and made it a condition of her rental that they would repair the same. That they promised and agreed to make such repairs, and maintain said stairway in repair during her tenancy. That said stairway remained in an unsound and unsafe condition until the time of her injury. She took possession of the premises March 7, 1925, and about a month thereafter, following repeated requests from her, the stairway was repaired. That the repairs were negligently made. That defendants negligently failed to replace or cause to be replaced the carriages of the stairway with sound material and neglected to fasten and secure the upper ends of said carriages at their junction with the floor, but permitted the same to remain in a defective and dangerous condition. That while she was descending the stairway in a prudent and careful manner, the upper end of the stairway suddenly broke loose from its fastenings and precipitated her to the basement floor, a distance of about eight feet, vertical, thereby causing the injuries of which she complains. That the fastenings gave way suddenly because of the rotten and decayed condition of the timber. That this rotten and decayed condition was covered up and hidden by the steps, and was unknown to her. That she believed at the time of the accident that the stairway had been properly repaired pursuant to defendants promise. That she was using the stairway at that time relying on that promise. That defendants knew, or by the exercise of reason-

able care should have known, the dangerous condition of the stairway. She then specifies the particular acts of negligence on which she relies, as follows:

"That defendants carelessly and negligently failed to keep said premises in repair pursuant to said lease and agreement with plaintiff; that defendants carelessly and negligently allowed said stairway to become and remain defective and dangerous; and carelessly failed and neglected to repair the same and to keep the same in a state of repair, all in violation of their duty and promise to plaintiff."

That by reason thereof she was damaged. She then alleges the manner of, and extent of her injury and prays judgment. The defendants filed an answer admitting the ownership and the rental of the property to defendant. They then alleged what amounts to a general denial, thereby putting at issue all the material allegations of the complaint.

The cause was tried to a jury which returned a verdict for plaintiff. Judgment was entered, from which this appeal is taken. At the close of plaintiff's case, the defendants moved for a nonsuit, and again at the close of the case they moved for a directed verdict. Both these motions were overruled and exceptions saved. There are eighteen specified errors in the bill of exceptions.

According to plaintiff's testimony, about four weeks after she took possession of the premises and after repeated telephone calls to the rental agency and one or two telephone calls to J. B. Steinbach, a carpenter appeared and made some repairs to the basement stairway and pronounced them "okay." She said she was not quite satisfied with the repairs, that she would have preferred new steps, but on the assertion of the carpenter that they were "okay" she

used them. She made no further complaint of their condition nor further requests for their repair to anybody. In June, 1928, they fell, causing her injury.

There is not a word of competent testimony as to how the stairway was defective or why it fell. There are certain well-established principles of law applicable to this case.

"A lessor is not obligated to keep leased premises in repair in the absence of an express contract to do so": *Kahn v. Love,* 3 Or. 206; *Fleischner v. Investment Co.,* 25 Or. 119 (35 P. 174); *De Wolfe v. Kupers,* 106 Or. 176 (211 P. 927).

"A lessor who has agreed to keep premises in repair is not liable for injuries to tenant caused by disrepair unless he had notice and knowledge of the need of repairs and a reasonable time thereafter in which to repair; such knowledge is not presumed from the fact of previous repairs by lessor": *Pinkerton v. Slocomb,* 126 Md. 665 (95 Atl. 965); *Fiorntino v. Mason,* 233 Mass. 451 (124 N. E. 283); 1 Tiffany Landlord and Tenant, 586; 16 R. C. L. 1052; *Ashmun v. Nichols,* 92 Or. 223 (178 P. 234, 180 P. 510).

With these legal principles in mind, the only theory upon which plaintiff could recover is: (1) that the lessor covenanted to repair; (2) that he did repair, but that the repairs were negligently made; (3) that because the stairway fell (more than three years after the repairs) the jury must presume the repairing was negligently done.

Plaintiff's testimony clearly shows that at no time did she have any dealings directly with the owners of the property. Her claim is that her lease and all other dealings were had through agents. Waiving the question of agency and contract to repair, and assuming that there was an agreement on the part of the lessors to repair, and that they did repair, there is no evidence that the repairs were negligently made, unless

we accept the fact that the stairs fell, three years after the repairs were made, as evidence of such negligence. The testimony on the repairs is as follows:

"We had to use a window to get into the basement, because the steps were just so bad that we were afraid to go down them; so I kept calling up the Wakefield & Fries; so finally they sent a man and he did a little work around,—picked up some old lumber in the basement and nailed on to the steps.

&ast; &ast; &ast; &ast; &ast;

"Q. Come down to the time of this accident, the time that this accident happened, what occurred?

"A. Well, I—I started down in the basement and walked about—I guess I went down about two or three steps before it just went right down with me, and I don't—didn't remember anything else, I don't guess, for a couple of hours.

&ast; &ast; &ast; &ast; &ast;

"Q. Mrs. Teel, do you remember how far down the steps you were when you fell?

"A. Well I was just at the top of the steps, just about two steps or—just left the floor,—just stepped down, and the whole thing went down with me.

"Q. Before the carpenter repaired the steps what was their condition?

"A. Well, they were shaky, and I feared to step on them, they were so shaky; and the steps were—I just stepped on them and they just felt as if they were going down,—just like that (illustrating); and we were scared to use them.

"Q. After he repaired them, what was their condition,—what did the condition appear?

"A. Well they appeared to be very near good; he just picked up an old piece of timber and placed on the bottom of the steps.

&ast; &ast; &ast; &ast; &ast;

"Q. After these repairs were made, were the steps steady, or not?

"A. They seemed to be fairly steady.

"Q. Well, you would know; you were going up and down there.

"A. Well, of course, they were old steps; they weren't like new steps would be—they was—

"Q. (Interrupting) At the time they fell, or before they fell, did you have any warning of any sort that they might give way?

"A. No, sir.

"Q. And do you know what caused them to give way? Do you know why they broke?

"A. Well, several of the men that was working—

"Q. (Interrupting) Not what anybody told you. Do you know, of your own knowledge, what caused them to break?

"A. Yes; after I got up out of bed and went to look at them, why, then I knew what it was; they were just rotten from the steps where they were put on to the floor; they were just rotten. It showed—the timber had been there for fifty years.

"Q. Well, now, did you have any knowledge that those sticks were rotten before the accident?"

On cross-examination she testified:

"Q. Just what was it that this carpenter said to you when you asked him had he made a proper repair of the steps?

"A. We were—I was standing in the basement with him. He had a piece of old timber, and he sawed it, and put it on the steps and nailed it there, and he said the steps was okay.

"Q. That was all he said, the steps were okay?

"A. Yes, sir; and I told him at the time that the steps looked like they needed new steps, why didn't he put in some new ones, and he said those were okay.

"Q. You didn't think they had been properly repaired when you saw what he did?

"A. Well he told me they would be.

"Q. But you saw they were the same old steps you described to the jury?

"A. I preferred new steps, if it had been left to me; but he said that the steps were properly repaired.

"Q. And the fact is, you saw exactly what he did to them, according to your statement?

"A. Well, I seen him take that timber and put on the steps.

"Q. All you saw him do was to take a piece of old timber and put it at the bottom of the steps?

"A. Well, he was down there nailing for quite a while. I was there when he was sawing a piece, and I says, 'How is those steps?' and he says, 'Perfectly alright'.

"Q. I again ask you, the truth is all you say he did was to put in a piece of old timber at the bottom of the steps?

"A. He filled out the steps that were vacant, I think, three or four steps at the bottom.

"Q. Did he put back every step—there were some places not even steps there—steps missing?

"A. Yes, sir.

"Q. I see.

"A. Wasn't even steps there.

"Q. He put all those in?

"A. Yes, sir; he put all those in.

"Q. And were all those in at the day of the accident?

"A. Yes, sir.

"Q. Every step?

"A. I guess so. I don't remember. I knew it fell.

"Q. You don't remember whether on the day of the accident all the steps were there or not?

"A. The steps were all there I am sure.

"Q. I understood you to say you don't remember.

"A. Well, I say I didn't go down after I had fallen and seen they were still all there.

"Q. You were down there a few days later, weren't you?

"A. Oh yes, I go down; but I mean after I got hurt.

"Q. Were all the steps there?

"A. Yes, they were there.

"Q. Just like they were before?

"A. Just the same.

"Q. About when was it you went down there looking at these steps after these accident?

"A. I didn't see them after the accident. I only seen the hole where they were.

"Q. Only seen them before?

"A. I only seen the hole where they were. They opened the door,—you see, I was on crutches; I couldn't go on down in the basement.

"Q. I thought you said you saw where they were all decayed, fifty years old.

"A. No, no; I said they opened the door for me to see down in the basement, and they said the steps were all decayed at the top where they was connected to the boards.

"Q. Did they say so, or did you see that?

"A. Well, I didn't—I said that was what they said; the boys that looked at this.

"Q. Didn't you tell the jury you saw that yourself,—all decayed, and it was fifty years old?

"A. No; I said the house looks like it was fifty years old,—an old house; but they put a new top over it.

"Q. You figured the steps were as old as the house?

"A. I don't know.

"Q. Did you look down to see where the steps were when you went there to look this time after the accident?

"A. I—I—my son had hold of me and he said, 'look what a hole you fell into.' In fact, I think you looked in the hole didn't you, and saw it when you looked at it.

\*      \*      \*      \*      \*

"Q. If I understood you, when this fellow came over and fixed them, all he did was to put some board at the bottom of the steps; you didn't tell the jury anything about putting any treads on, did you?

"A. I didn't say treads; I don't know what they were.

"Q. Did you tell the jury he did anything else except put some old boards at the bottom of the steps?

"A. He did—fix the steps. I don't know where—but he fixed them where the ones were off.

"Q. After he left there, all the treads were on?

"A. Yes, sir; and he said it was all right; yes, sir.

"Q. And were all these treads on the day that these steps fell with you?

"A. Well, the day before that I didn't see any off.

\* \* \* \* \*

"Q. When you came to that hole afterwards and looked down, did you see any treads off the steps then?

"A. Well, no, I don't—the steps—I couldn't see the steps. Just seen that big hole there."

The foregoing is all the testimony regarding the repairs of the steps. There is no complaint regarding the skill or ability of the carpenter who made the repairs. No complaint of the lumber that was used. She said it was old lumber but that would not mean that it was unsound or unfit for the purpose for which it was used. There is no evidence from any source regarding the length of time that such repairs should reasonably last. The jury was simply left to guess.

■■ It is practically admitted by plaintiff that unless she can invoke the doctrine of *res ipsa loquitur* there is not sufficient evidence to submit the case to the jury. Then taking the case solely from plaintiff's testimony and entirely ignoring defendant's allegations and testimony, this leaves her case in this situation. She made it a condition of her tenancy that the stairs be repaired. This was done. She saw the repairs that were made and how they were made. She made no complaint as to the manner or method of the repairs nor at any time thereafter made any request for further repairs. She said the house looked to be fifty years old. She could only expect such repairs as would reasonably be made to such a building. There may have been many reasons why the stairway fell. We are unable to find a single case, where negligence in repairing was based simply on the falling of a stairway three years after repairs were made, that has been sustained.

Plaintiff in her testimony said that she was told by the boys, who opened the door for her to look at the place where the stairs had been before the accident, "the steps were all decayed at the top where they was connected with the boards." These boys were not called to testify in regard to the condition of the stairway. The instant case falls fairly within the facts and principles of law announced in *Pinkerton v. Slocomb,* supra. Plaintiff testifies that she was present when the repairs to the stairway were made. That the lessors were not present at the time, nor at any time thereafter prior to the time of the accident. We are unable to find a single case where the doctrine of *res ipsa loquitur* is applied to the defendant unless the defendant was in control and possession of the instrumentality causing the injury. (See 7 Words and Phrases, First Series, page 6136 et seq.; 4 Words and Phrases, Second Series, page 315 et seq.; 6 Words and Phrases, Third Series, page 745 et seq.); *Nutt v. Southern Pacific Co.,* 25 Or. 291 (35 P. 653); *Phillipsen v. Hunt,* 129 Or. 242 (276 P. 255).

In the instant case the plaintiff was in possession and control of the premises. She was using the stairway almost daily, and was in a position to know their condition much better than defendants. The lessor owed no duty to repair unless notified.

Taking this view of the case it is unnecessary to pass on the other questions raised. The court should have directed a verdict for defendant. It follows the judgment must be reversed with instructions to set it aside, and enter a judgment in favor of defendant.

BEAN, C. J., BROWN and BELT, JJ., concur.