Argued January 6; affirmed January 19, 1943

# ASHEIM *v.* FAHEY ET AL.

(133 P. (2d) 246)

Before BAILEY, Chief Justice, and BELT, LUSK, BRAND and HAY, Associate Justices.

*David Weinstein* and *Nicholas Jaureguy,* both of Portland (David Weinstein and Cake, Jaureguy & Tooze, all of Portland, on the brief), for appellant.

*Lou A. Recken,* of Portland (Senn & Recken, of Portland, on the brief), for respondents.

HAY, J. This is an action in tort for damages for personal injuries.

The defendants are copartners and, as such, are tenants of a building in the city of Portland known as the Raleigh building, under a lease dated December 30, 1930. They themselves occupy the second floor of such building, and, on October 18, 1937, they sublet two store rooms on the ground floor to one Gordon Wilson. On September 15, 1938, Wilson, with defendants' consent, assigned his lease of one of such store

rooms to Wilson Shirt Shop, Inc., a corporation. The plaintiff and appellant herein is an employee of such corporation and is also the president thereof.

The original lease by Fahey-Brockman to Wilson contained, among others, the following provisions:

"Twelfth. Said Lessors shall keep the walls and ceilings and floors and all plumbing and steam pipes and fixtures in said Leased Premises—and also any pipes or wires that pass through said leased premises in and for the purpose of reaching and serving other parts of the building—in good order and repair and in safe condition during the term of this lease; but such obligation of said Lessors shall not extend to or require them to do any painting work or to make any repairs to any store-front heretofore or hereafter installed by said lessee; and said Lessors shall not be required to make any repairs or alterations or additions or improvements in or to or upon said Leased Premises except as expressly provided in this Paragraph. * * *

"Eighteenth. Said Lessee will, at any and all reasonable times permit said Lessors and their agents and representatives to enter and go upon any part of said Leased Premises for the purpose of examining the condition of the same or for the purpose of repairing or renewing pipes or wires or plumbing that pass through said leased premises to or serve other parts of said building or for the purpose of making any other repairs or improvements in or to any part of said building."

The lease further provided that it might be assigned by consent of the lessors, and that its provisions should inure to the benefit of and bind the successors and assigns of the lessors and lessee respectively.

On May 15, 1940, at about midday, while the plaintiff, in the performance of his duties as an employee

of Wilson Shirt Shop, Inc., was standing in the store room which had been sublet to that concern, without warning practically the whole ceiling of the store room fell, and he was struck by portions thereof and thereby suffered serious injuries.

Plaintiff seeks to recover damages for such injuries from the defendants, Fahey-Brockman, and in his complaint he charges them with negligence in failing to keep the ceiling in good order and repair and in a safe condition; in failing to inspect it and the condition thereof; in allowing and permitting it to be overburdened by shavings, ends of lumber and other debris; in failing to ascertain the fact that it was in a ruinous and unsafe condition; and in allowing and permitting it to be insecurely affixed to the beams to which it was attached.

The answer of the defendants is in the nature of a general denial, with an affirmative defense to the effect that there was no privity of contract between plaintiff and defendants.

At the conclusion of plaintiff's case, the trial judge sustained a motion for a judgment of involuntary nonsuit against him, and judgment was entered accordingly. Plaintiff appeals.

It is the contention of plaintiff that, by the terms of the lease, the defendants were under an absolute obligation to keep the ceiling in good repair and in safe condition, and that their failure to keep it in safe condition rendered them liable for plaintiff's injuries, regardless of whether or not they were in fact negligent. In other words, he seeks to hold them as insurers of his safety.

▇▇▇ In the absence of a special agreement to make repairs upon the demised premises, a landlord is under

no duty to do so. 32 Am. Jur., Landlord and Tenant, section 705. He may, of course, by the terms of his lease, covenant to make repairs, but the law in that connection is that he must have timely notice of the need for repairs before he is obliged to make them. If, after such notice and a reasonable opportunity to make the repairs, the landlord fails to do so, and damage to the tenant or his invitees results, the landlord may be held liable. *Ashmun v. Nichols,* 92 Or. 223, 234, 180 P. 510; *Teel v. Steinbach Estate,* 135 Or. 501, 504, 296 P. 1069.

■ The plaintiff concedes that the law is generally as we have stated above, but argues that in this case, under the terms of the lease, it was incumbent upon the defendants to maintain the ceiling in safe condition throughout the term. The lease contained no covenant on the part of the landlord respecting the condition of the leased premises at the commencement of the term, and the evidence is that there was at that time no indication whatever of any defect or structural weakness in the ceiling. Under those circumstances, it would not appear that there was any necessity for the landlord to have taken any affirmative action toward making a special inspection of the condition of the ceiling. *Dodak v. Lewis,* 187 Wash. 138, 59 P. (2d) 1121. Conceding that an apparent need of repairs would have been sufficient in itself to put the landlord under notice to repair, there was no such apparent need in this case, either at the commencement of the term or thereafter, until the ceiling actually fell.

"* * * But in order that it may be the duty of the landlord to investigate, there must be something to suggest an investigation. It is not negligence to fail to discover a concealed weakness in a wall where its appearance indicates soundness

and strength. * * *" 32 Am. Jur., Landlord and Tenant, section 694.

The plaintiff relies principally upon the doctrine enunciated in certain Massachusetts decisions. The principal of these is the case of *Fiorntino v. Mason,* 233 Mass. 451, 124 N. E. 283, from which we quote:

"The kinds of relations between landlord and tenant. which have arisen in our decisions out of oral contracts establishing a tenancy at will may be divided into three general classes:

"First. The ordinary oral contract for tenancy at will without further agreement. The respective rights and obligations of the landlord and tenant under such a contract for a tenancy at will are well settled. There is no implied agreement, apart from fraud, that the demised premises are or will continue to be fit for occupancy or safe and in good repair. The tenant takes the premises as he finds them and there is no obligation on the landlord to make repairs. The landlord is not liable for injuries arising from a defective condition unless he has undertaken to make repairs and has made them negligently. Kearines v. Cullen, 183 Mass. 298; Mackey v. Lonergan, 221 Mass. 296.

"Second. The parties may agree that the landlord shall make necessary repairs during the tenancy and thus vary the rights and obligations implied by the law as part of the ordinary relation of tenancy at will. An agreement to repair as a part of the letting is an agreement to make repairs on notice. Failure to comply with such agreement gives rise merely to a right of action for breach of contract, where the damages commonly are only the cost of making the repairs. A negligent omission to repair is not ground for an action of tort. Tuttle v. Gilbert Manuf. Co. 145 Mass. 169. The landlord under such a contract is not liable for personal injuries resulting from a defective condition of the premises unless he makes repairs and

makes them negligently. Conahan v. Fisher, 233 Mass. 234, where cases are collected.

"Third. The parties may make a still different agreement to the effect that the landlord shall keep and maintain the premises in a condition of safety on his own responsibility and without reference to notice from the tenant of defective conditions, and by virtue of the agreement for letting shall have and constantly retain such possession of the premises as is necessary for that purpose. It is one thing for a landlord to agree with a tenant that he will make repairs on the demised premises on notice that repairs are needed. That is an agreement of the second class. It is quite another and different thing for a landlord to agree that he continuously undertakes to keep the demised premises in repair and to relieve the tenant from any attention or thought respecting notice of needed repairs, so that the tenant may be as care free respecting the condition of the demised premises as is the guest in a hotel respecting the room assigned for his occupancy. Under such an agreement the landlord assumes the duty of looking after the tenement as to safety and retains so far as necessary to that end the possession thereof and the right to enter upon it at all times. There is nothing impossible in fact or law about such an agreement. Miles v. Janvrin, 196 Mass. 431; S. C. 200 Mass. 514. It is, however, a most onerous undertaking. See Ryall v. Kidwell & Son, (1914) 3 K. B. 135, 142. It is not made out by a simple agreement that the landlord will keep the premises in repair. That means no more than that he will keep them in repair on notice from the tenant. Such an agreement is of the second class. An agreement of the third class goes much further. It can be supported and proved only by evidence far more explicit than a mere general agreement to maintain in repair. It imposes an obligation on the landlord to enter upon the demised premises at all reasonable times for the purpose of inspection and ascer-

tainment of any defective condition. The landlord thereby assumes direct and initial responsibility for the condition of the premises as to safety at all times. Under such an agreement liability devolves upon the landlord for any failure reasonably to discover and remedy a defect or want of repair whereby injury ensues to any person to whom he owes the duty to inspect, discover and repair defects.''

■■ The plaintiff contends that the agreement of the defendants to keep the premises in good repair and in safe condition throws the case into the third class mentioned above. We agree, of course, that a landlord may covenant in such stringent terms as to make himself the insurer of the safety of the tenant, but it does not appear to us that this is such a case. Here, the landlords demised the whole premises to the tenant, and reserved only permission to enter at reasonable times for the purposes of inspection or repair. To say that this reservation laid upon them an absolute obligation to enter the premises ''for the purpose of inspection and ascertainment of any defective condition'', is not warranted by anything in the lease. Under the third class of leases mentioned in the Fiorntino case, where the landlord is required to ''maintain the premises in a condition of safety on his own responsibility and without reference to notice from the tenant of defective conditions,'' retention of possession by the landlord to the extent necessary for such purpose is essential. This is made apparent by the Massachusetts case of *Miles v. Janvrin*, 196 Mass. 431, 82 N. E. 708, 13 L. R. A. (N. S.) 378, 124 Am. St. Rep. 575. There it is pointed out that the third class covers a demising of the leased premises, not to the tenant but to the tenant's use, with retention of possession and

control by the landlord. In such case, no notice to repair is necessary. Where, however, as here, the demise is of the whole premises, with possession and control given to the tenant, the landlord is required to repair only upon notice. We quote from that case, at page 438 of the Massachusetts report:

> "In determining whether an agreement by a landlord with a tenant to keep in repair generally a portion of the premises during the term of the lease is a contract to maintain those premises in a safe condition for the tenant's use, or is a contract to keep them in repair as the premises of the tenant, the necessity of a notice from the tenant to the landlord that repairs are needed before the landlord can be taken to be in default under his contract is important. Where by force of the contract the landlord is to maintain the premises in a safe condition for the tenant's use, no notice is necessary. But where the landlord's contract is to keep the premises in repair as the premises of the tenant during the term of the lease, as matter of implication notice is necessary before the landlord is in default. For cases where it was held that notice was necessary see Hutchinson v. Cummings, 156 Mass. 329; McLean v. Fiske Wharf & Warehouse Co. 158 Mass. 472, 474; Marley v. Wheelwright, 172 Mass. 530; Cummings v. Ayer, 188 Mass. 292."

Plaintiff also cites the case of *Crowe v. Bixby,* 237 Mass. 249, 129 N. E. 433. That case involved damages sustained through the collapse of a piazza which was a part of the leased premises, which collapse was alleged to have been due to disrepair chargeable to negligence on the part of the defendant. The lease was oral, and the testimony was to the effect that the landlord "agreed to keep the place in repair and safe to live in". The court held that such an agreement was an undertaking on the part of the defendant to keep

the premises in repair on his own responsibility, without notice from the tenant of defective conditions and without a request to him to make such repairs. The evidence showed, however, that the piazza was in very evident need of repair. We assume that it was on the outside of the demised premises, and hence that the case may be classed with those affecting common passageways, stairways, etc., which a landlord is required on his own responsibility to maintain. The court held merely that the landlord was bound to keep the premises in a "reasonably safe condition" (page 254). Moreover, it held that the agreement as to the extent of the landlord's duty to repair had been given a practical construction by the acts of the parties themselves.

In *Moore v. Steljes*, 69 Fed. 518, cited by plaintiff, the lease provided that the landlord should keep the premises in a safe condition. The ceiling fell, injuring a member of the tenant's family. In overruling a demurrer to the complaint, the court said:

"The premises were let to the father for occupation by his family, including the plaintiff, and injury to her would be a natural consequence of the dangerous ceiling; and the warranty was made in view of this consequence. And, although the plaintiff could not maintain an action upon the warranty, it serves to fix the negligence which caused the injury to her upon the defendant."

A reading of the decision, however, fails to disclose the terms of the "warranty", and the case is not very helpful.

■ Notwithstanding the fact that in the case at bar the tenant had possession and control of the demised premises, the plaintiff apparently seeks to impose upon the defendants a greater duty than is imposed

upon a landlord in connection with the maintenance of common passageways, stairways, etc. In such cases, even if the landlord has notice of a dangerous condition, he is required only to exercise reasonable diligence to protect his tenants from the danger. The rule is enunciated in the case of *Massor v. Yates*, 137 Or. 569, 572, 573, 3 P. (2d) 784, and, in commenting thereon, this court said:

"* * * This is a flexible rule and it does not make the landlord a guarantor of the safety of the tenant but obliges him only to use that degree of care which an ordinarily prudent person engaged in the operation of an apartment house would have exercised under similar circumstances."

In concluding our discussion of this branch of the case, we quote the following from Restatement of the Law of Torts, vol. 2, section 357:

"A lessor of land is subject to liability for bodily harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession, if

"(a) the lessor, as such, has agreed by a covenant in the lease or otherwise, to keep the land in repair, and

"(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented.

"Comment:

"a. Nature of lessor's duty. The lessor's duty to repair in so far as its breach subjects him to liability for bodily harm caused to the lessee and those upon the land in his right, is not contractual but is a tort duty based on the fact that the contract gives the lessor ability to make the repairs and control over them. The lessor is not liable for bodily harm caused even to his lessee by his failure to make the premises absolutely safe. He is liable only

if his failure to do so is due to a lack of reasonable care exercised to that end. Like many other tort duties to keep land in safe condition, the lessor's duty to repair is not delegable, and he is liable as fully where the failure to make the premises reasonably safe is due to the negligence of an independent contractor to whom the lessor has entrusted the performance of his contract as he is where it is due to his own personal negligence. Since the duty arises out of the existence of the contract to repair, the contract defines the extent of the duty. Unless the contract stipulates that the lessor shall inspect the premises to ascertain the need of repairs, *a contract to keep the interior in safe condition subjects the lessor to liability if, but only if, reasonable care is not exercised after the lessee has given him notice of the need of repairs.''* (Italics ours.)

■ The plaintiff insists that, in any event, there was sufficient evidence of negligence on the part of the defendants to require the submission of the case to the jury. In this connection, he contends that the doctrine of res ipsa loquitur applies in cases in which the landlord has exclusive control of the premises, and with this contention we agree. The difficulty in the application of this rule to the facts in the present case is that here the landlords had no exclusive control over the leased premises, nor, for that matter, any control whatever. All that they had was a permissive right to enter the premises at reasonable times for the purposes of inspection and repair. The defendants conceded that no inspection of the ceiling was made by them, but the evidence is that any such inspection would have been futile. The Raleigh building is quite old, and the ceiling in this particular store room had been in place, and in apparently good condition, for thirty or forty years—probably longer. There was no

sign of any defect in the ceiling or of any need of repair. No wet spots or cracks were apparent, nor was there any indication of sagging. Some time previous to the accident, the floor of the premises occupied by the defendants immediately above this store room had been removed and a new floor installed, and plaintiff urges that inspection of the ceiling of the store room at that time could have been easily effected, but the evidence does not indicate that anything short of tearing down the ceiling would have developed that it was in a weakened condition. While the plaintiff, in his brief, argues that there is evidence that, when the floor was removed, considerable lumber ends and other debris were left on the ceiling, thereby making its condition dangerous, a reading of the transcript does not indicate that there was any such evidence. The reason why the ceiling fell, according to an expert witness called by the plaintiff, was that the nails which attached it to the floor beams above were too short and not sufficiently heavy. That condition, said the expert, could not have been discovered without tearing down the ceiling, unless it was sagging, which was not the case. Under the circumstances, we do not believe that, in the exercise of reasonable care, the defendants were required to take such a drastic course as that of tearing down the ceiling in order to determine its safety. In this connection we quote the following from *Thompson v. Cooles*, 7 Harr. (Dela.) 83, 180 A. 522, 526:

"If the inference of negligence is referable to the original construction of a ceiling, it is difficult to see the justice in holding a defendant responsible for all the complexities of the plastering art, the materials, proper mixing, the application and the drying out process, all of which determine a good or bad ceiling, and which may have lasted for years without noticeable defect, unless the defendant is

regarded as an insurer. If the inference of negligence is referable to lack of inspection, then arises the query; does a reasonably prudent man, 'guided by those considerations which ordinarily regulate the conduct of human affairs,' regard it as reasonably necessary to inspect and examine a ceiling the strength of which he had had no cause to suspect, and which has offered no visible indication, by cracking, sagging, or bulging, of an unsafe condition? We think not.''

■ The cases relied upon by the plaintiff to support the applicability of the doctrine of res ipsa loquitur to the facts of this case are all cases in which the defendant had exclusive control of the premises. *Gillilan v. Portland Crematorium Assn.*, 120 Or. 286, 249 P. 627; *Suko v. Northwestern Ice & Cold Storage Co.*, 166 Or. 557, 113 P. (2d) 209; *Donis v. Sawyer Service, Inc.*, 143 Or. 433, 21 P. (2d) 776; *Kelly v. Lewis Inv. Co.*, 66 Or. 1, 133 P. 826; *Esberg Cigar Co. v. Portland*, 34 Or. 282, 55 P. 961, 43 L. R. A. 435, 75 Am. St. Rep. 651; *Windas v. Galston & Sutton Theatres, Inc.*, 35 Cal. App. 533, 96 P. (2d) 170; and Cooley on Torts, 4 ed., vol. 3, section 480. As illustrative of the necessity for possession and control by defendant before res ipsa loquitur can be invoked, we quote from *Slater v. Barnes*, 241 N. Y. 284, 149 N. E. 859:

''These instructions in our opinion violated one of the fundamental conditions permitting the application of the rule of res ipsa loquitur. That rule, amongst other things, is predicated upon the condition that the agency which has produced an injury is within the exclusive possession, control, and oversight of the person charged with negligence whence, legitimately, flows the inference that, if there is any explanation of the accident consistent with freedom from negligence, he ought to be able to give that explanation, and, if he does not give it, a presump-

tion arises against him. The reason for, and common sense of, this rule under such conditions is obvious. It frequently happens in the law that, if a person fails to explain that of which apparently he has knowledge, the presumption goes against him. Griffin v. Manice, 166 N. Y. 188, 59 N. E. 925, 52 L. R. A. 922, 82 Am. St. Rep. 630.

"But that condition did not exist at all in this case. This piece of plaster, on plaintiff's theory, had remained in place for four years without so far as appears, any sign of weakness or unsafe condition as the result of negligent repair in 1913. We can imagine that a variety of causes might have made it fall after a lapse of four years. But however many or potential these causes may have been there is nothing to indicate that the defendant had any opportunity to observe them. He was not in possession of the premises or at a post of observation, and therefore, when the trial judge erroneously imposed upon him this duty of explanation of something which happened beyond the realm of his observation or control, he in effect instructed the jury to find a verdict against him."

We are of the opinion that the plaintiff failed to introduce sufficient evidence of negligence to take the case to the jury, and that, because of the fact that the defendants did not have exclusive possession or control of the demised premises, the doctrine of res ipsa loquitur does not apply. The learned trial judge was correct in his ruling on defendants' motion for involuntary nonsuit. The judgment is affirmed.