Argued December 1, 1942; reversed February 16, 1943

# DOHERTY *v.* ARCADE HOTEL

(134 P. (2d) 118)

Before KELLY, Chief Justice, and BELT, ROSSMAN, BAILEY, LUSK and BRAND, Associate Justices.

*William Kuykendall*, of Klamath Falls (D. V. Kuy-kendall, of Klamath Falls, on the brief), for appellant.

*U. S. Balentine*, of Klamath Falls, for respondent.

ROSSMAN, J. This is an appeal by the defendant from a judgment in favor of the plaintiff, based upon a verdict. The defendant admits that on July 6, 1940, that being the date of the plaintiff's injury, it "was engaged in the hotel business and owned and operated the hotel known as the Arcade Hotel in Klamath Falls, Oregon." It also admits that on the day just mentioned "the plaintiff occupied a room in defendant's hotel." The evidence warrants a finding that he was there as a paying guest.

The appellant's brief presents only one assignment of error:

"The Court erred in failing to grant a directed verdict in favor of defendant-appellant."

One of the plumbing fixtures in the plaintiff's room was a washbowl served with hot and cold water. The handles of the faucets were made of porcelain. The complaint says that they were installed eighteen years ago. July 6, 1940, while the plaintiff was shaving himself in his room, he undertook to shut off the hot water and then the following, according to his testimony, happened:

"I put my hand over against it (the porcelain handle of the hot water faucet) like that to shut it off a little bit and it broke with a sharp point."

He swore that the broken porcelain had sharp edges which cut his hand deeply. The complaint charges that the defendant neglected its duty to the plaintiff in the following particulars:

"In failing and neglecting to furnish a safe place for its guests and to this plaintiff * * * in maintaining porcelain faucet handles * * * in failing to inspect said room and said porcelain faucet handles."

The answer denies all averments which charge negligence. It alleges that the faucet handles in its hotel were in perfect condition, that they were daily inspected, and that the shattering of the one which injured the plaintiff was due to the fact that he, as "a man of strong and powerful physique, * * * struck the faucet handle with the base of his hand in such a manner as to shatter the faucet handle." Those averments are denied by the reply.

Uncontradicted evidence indicates that maids in the defendant's employ daily entered the plaintiff's room, made the bed, swept the floor, cleaned the washbowl and tidied up the room. In cleaning the washbowl they turned on the water and thus used the porcelain handles. The two maids who performed this service swore that they observed no defect in the handles. The plaintiff, who had occupied the room for one month and fourteen days before the accident, had observed nothing wrong with the handles.

Floyd Waters, a plumbing contractor in Klamath Falls, as a witness for the plaintiff, was asked, and answered, as follows:

"Q. Will you state whether or not porcelain faucet handles on hot water faucets have a ready tendency to break in the usual and ordinary use to which they are applied?

"A. Yes.

"Q. In your experience as a plumber, you may state whether or not you have observed all porcelain handles have a tendency, in the ordinary use on hot water faucets, to break and come apart in the ordinary use to which they are put.

"A. All porcelain faucets will, yes; the hot water more readily than the cold.

"Q. Will you state, Mr. Waters, whether or not on the 6th day of July, 1940, porcelain handles were of standard make and in general use in the plumbers' trade?

"A. They were not. They had not been manufactured for at least five years.

"Q. Do you know why they were discontinued for use?

"A. Being too dangerous for use.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

All porcelain handles are the same. They have porcelain about so long, with a pin through set in cement."

He estimated that "probably 30 or 40 per cent" of all faucets in Klamath Falls had porcelain handles.

J. H. Dyer, another plumber contractor in Klamath Falls, as a witness for the plaintiff, was asked, and answered, as follows:

"Q. Can you state as to their (porcelain faucet handles) tendency to break?

"A. Yes, they break.

"Q. Do you know whether or not they are in general use at the present day?

"A. They are not.

"Q. Do you know why they were not in general use during that time?

"A. Well, they are too dangerous."

He swore that even in new handles there is "a tendency for them to break."

"Q. It is in the manufactured article?

"A. The water gets—naturally you have to push it harder and when you do that you have a tendency to break the porcelain and cut your hand.

\* \* \* \* \* \*

They are only put on with cement, slip on; naturally when they get hot, it has a tendency to loosen the cement and when it does get loose and lets them wobble it breaks when any strain is put on."

When asked to compare the number of porcelain handles in use June 6, 1940, (date of plaintiff's injury) with all other types, he replied: "I should judge something about 30 per cent or something like that; 35 or 40."

According to those witnesses, the porcelain is fitted over a core of brass and is held to the latter by cement.

Arthur B. Keenan, a plumbing contractor, as a witness for the defendant, estimated that four-fifths

of all the faucets in Klamath Falls had porcelain handles. J. E. Friesen, another plumbing contractor also called by the defendant, thought that the number of porcelain handles in Klamath Falls was 50 per cent of all those in use. Both Keenan and Friesen swore that porcelain handles were still available upon the market. Friesen, referring to porcelain handles, testified: "They are coming back now on account of the scarcity of metal." Keenan accounted for the popularity of metal handles by saying: "Chrome plate looks better." Upon cross-examination, he was asked, and answered, as follows:

"Q. How about the safety of porcelain handles?
"A. Well, I would say they were safer.

\*       \*       \*       \*       \*       \*

Q. Do you know it is a fact that a great many people were injured by using that handle?
"A. I wouldn't say there is a great many people; there are a few people. If the handle is not checked or cracked, I would say there was no danger to it. Like the plates on your table,—if there are checks formed in them, in that condition they are dangerous.

\*       \*       \*       \*       \*       \*

I have been here fifteen years and some I installed when I came here are still in perfectly good condition.
"Q. And a great many are not?
"A. I wouldn't say a great many; some are not. I was working in the Willard Hotel; they were put in in '26,—I was working there yesterday, and they were in good condition, the one I was working on yesterday.
"Q. And they were replaced from time to time?
"A. These I worked on were not.
"Q. And they were installed in '26?
"A. Yes, it was built in '26."

Friesen knew of no one who had been injured by the breaking of a porcelain handle.

The testimony of the four plumbing contractors indicates that porcelain handles were in general, if not universal, use until several years ago. Then metal handles began to appear. The early metal handles were unsatisfactory because the nickel-plate finish peeled off the brass of which the handle was made. Very few of them were sold. According to Dyer, chromium-plated handles came upon the market "four or five or six years ago." From Waters' testimony, we quote:

"Q. Is it not a fact then these things (porcelain handles) were placed on the market and sold up to about four or five years ago?
"A. Correct.
"Q. And they were sold and offered for sale by yourself and general wholesalers and distributors?
A. Yes.

*   *   *   *   *   *

Q. They were offered for sale to the general public and in use until four or five years ago?
"A. That is right."

Keenan, referring to porcelain handles, swore:
"They were generally in use until about 1930; nickel-plated handles,—a few of them came out before that time, but there were very few.   *   *   *
so porcelain handles were then universally used until about 1930."

Still referring to porcelain handles, he said:
"They were installed up to '36, or something like that.
"Q. And then they stopped installing them; is that correct?

"A. No, I would not say they did.

"Q. Only on special request?

"A. No; if a fellow makes a good buy on them he naturally installs them, that is all."

Waters had testified that the wholesale house from which he purchased his fixtures no longer sold porcelain handles. Keenan, evidently in response to the axiom that "seeing is believing," produced one, and then swore: "You can still buy them in specialty houses and obtain them from the trade; you can buy tips and put on that brass part again." Friesen, referring to his shop, said: "We have a few (porcelain handles) in stock." He added: "You could still buy them at any wholesale house" and "As a general rule, if the owner or contractor specifies them in their specifications we furnish them; if they are not specified we use the other type."

It is the chromium-plated handles that have won favor. None of the witnesses claimed that porcelain handles which remained in satisfactory condition were replaced with metal handles. It is in new construction that chromium-plated handles are used. According to the witnesses, porcelain handles are still used to replace broken ones of that kind when it is desired to match existing fixtures.

The defendant's hotel is apparently a small one. Whether or not its manager or any of the officers of the defendant corporation knew that porcelain handles occasionally break, is not disclosed by the record. If any porcelain handle which formed a part of the defendant's plumbing fixtures broke before the one which injured the plaintiff, that fact was not mentioned by any witness.

The evidence indicates that the following are the causes of the breaking of porcelain handles: (1)

Water which is excessively hot loosens the cement which binds the metal to the porcelain, and the latter, when thus loosened, may break when pressure is applied to turn the water on or off; (2) when the gaskets in the faucets become worn and the needed extra force is applied to shut off the water completely, the porcelain may break; (3) hot water may cause the metal core inside the porcelain to expand and thus break the porcelain. No one undertook to state what caused this handle to break. The plaintiff, in refutation of the averments of the answer, testified that he did not strike the handle a hard blow. He swore that this faucet did not leak; hence, we assume that no extra pressure was required to shut it off. He did not claim that the faucet ran water that was excessively hot.

The above, we believe, is a sufficient review of the evidence.

■■ Both sides are agreed that the defendant hotel-keeper was not an insurer of the plaintiff's safety, and that it owed him no greater duty than that of exercising reasonable care to assure his safety while upon its premises, provided he made no unreasonable use of them. Accordingly, it was the defendant's duty to have exercised such care in the maintenance of its plumbing fixtures that the plaintiff could use them in the ordinary way without danger. See *Scholl v. Belcher,* 63 Or. 310, 127 P. 968; 28 Am. Jur., Inkeepers, p. 581, § 60; and Annotation 118 A. L. R. 1103. *Stovall v. Newell,* 158 Or. 206, 75 P. (2d) 346, in which the relationship was that of landlord and tenant, supports the statements just made.

Let us now see whether the record contains any substantial evidence showing that the defendant breached the duty just stated.

■ In *Nettles v. Emerick*, 22 Fed. Supp. 441, the United States District Court held that the breaking of a porcelain handle in the hand of a hotel guest "cast the burden on the defendant to show that he was not negligent in the maintenance of the faucet." We observe, however, that other courts have not employed the doctrine of *res ipsa loquitur* in this type of case: *Walker v. Toledo Hotel Co.*, 59 Ohio App. 229, 17 N. E. (2d) 422, and *Adams v. Dow Hotel*, 25 Cal. App. (2d) 51, 76 P. (2d) 210. In both of those cases a hotel guest was injured by the breaking of a porcelain faucet handle in his hand. See also *Rose v. Adelphia Hotel*, 300 Pa. 1, 149 Atl. 644; *Mitchell v. Hotel Berry Co.*, 34 Ohio App. 259, 171 N. E. 39, and *Hoffman v. Shad*, 221 App. Div. 668, 224 N. Y. S. 722. In *Dittert v. Fischer*, 148 Or. 366, 36 P. (2d) 592, this court said:

"The doctrine of *res ipsa loquitur* is only available when the instrumentality, causing the injury complained of, is entirely under the control of the one against whom the charge of negligence is made."

That statement was warranted, not only by our earlier decisions but also by the treatise written by the pre-eminent authority in the field of evidence, Wigmore on Evidence, 3d ed., § 2509. See also the carefully reasoned decisions rendered in *Stanolind Oil & Gas Co. v. Bunce*, 51 Wyo. 1, 62 P. (2d) 1297.

■ At the time of his injury the plaintiff, and not the defendant, had possession of the porcelain handle. He had been using the washbowl for several minutes immediately before his injury and at the moment when the handle broke it was in his hand. Under those circumstances, the doctrine of *res ipsa loquitur* is inapplicable. The plaintiff is not entitled to a presumption that the defendant was negligent. The burden, there-

fore, rested upon him to come forward with evidence showing that the defendant was actually negligent. Let us determine whether he discharged the burden.

The basic facts upon which the plaintiff depends are that procelain handles were obsolete when the injury occurred and that safer equipment was available. It will be remembered that Waters, a witness for the plaintiff, testified as follows:

"Q. Is it not a fact then these things (porcelain handles) were placed on the market and sold up to about four or five years ago?

"A. Correct.

"Q. And they were sold and offered for sale by yourself and general wholesalers and distributors?

"A. Yes."

That testimony was given December 15, 1941. The injury occurred July 6, 1940. Therefore, porcelain handles were still commonly sold up to two and one-half or three and one-half years prior to the plaintiff's injury. In other words, four years or so before the injury the contention which underlies this case could not have been made.

The march of science and art and the development of modern improvements bring in their wake negligence litigation based upon contentions similar to the one now before us. For instance, in *France v. Rome, W. & O. R. Co.*, 88 Hun. 318, 34 N. Y. S. 408, the plaintiff claimed that her decedent, who had been a fireman on the defendant's railroad, lost his life through the failure of the defendant to equip its cars with air brakes. She charged that the use of hand brakes was an act of negligence. In reversing a judgment for the plaintiff, the court said:

"The first question presented for consideration in this case is as to the propriety of the submission

to the jury of the question of the defendant's omission to furnish air brakes upon its train, as a ground of negligence * * *. At the time of the accident the use of air brakes may be said to have been in its infancy, and their practical efficiency was not, perhaps, thoroughly established. While it was shown that they had been adopted and were in use upon several railroads in the state, still the evidence failed to show that they were in general use. The question of their efficiency in controlling the movement of trains was not at that time as well understood as now. We think the court improperly submitted to the jury the question of the defendant's negligence based upon its omission to supply its cars with air brakes. * * * He is simply required to furnish those that are reasonably safe and suitable, such as a prudent man would furnish if his own life were exposed to the danger that would result from unsuitable or unsafe appliances.''

In *Mitchell v. Brooks*, 165 Miss. 826, 147 So. 660, an employee who was injured claimed that his employer was negligent through having failed to furnish a recently developed safety appliance. In holding that the circumstances did not show negligence, the court said:

''A person or corporation is not required to use the latest and safest appliances and equipment. All that is required of such is to furnish a reasonably safe place and reasonably safe appliances, equipment, tools, etc.''

In *Bradley v. Nashville, C. & St. L. Ry.*, 82 Tenn. 374, the plaintiff claimed that his decedent's death was caused by the failure of the defendant to install an improved coupling device. In sustaining a judgment for the defendant, the court said:

''The ninth exception is to the charge of the court in instructing the jury that the company was

bound to provide its cars with such fixtures and apparatus as were calculated and reasonably necessary to insure the safety of its employes. This instruction was repeated in other parts of the charges, and the judge added that 'it is not necessary to change the machinery and fixtures in order to apply every new invention or supposed improvement. If the proof satisfies you that the necessary apparatus or fixtures, the drawheads, coupling-pin, links, etc., attached to the engine and the car were such as were in common use, and were safe and fit for the purpose for which they were used although in the opinion of the jury not as safe as another kind, yet the company would not be liable on this ground.' 'But,' said his Honor, 'if the machinery or apparatus was unsafe, and not such as should have been used, having in view the safety of employes, and deceased came to his death by reason thereof, the plaintiff is entitled to recover.' * * *

"The charge as given was correct, and the defendants were not bound to abandon the use of all their rolling stock and obtain new cars and tenders and engines whenever some supposed improvement is made, * * *."

From *Nutt v. Southern Pacific Co.*, 25 Or. 291, 35 P. 653, we quote:

"Another objection relates to the testimony of certain witnesses who seem to have been called as experts for the purpose of showing that the manner of lowering the tiles from the car with a 'snub' rope was not as safe as if a block and tackle had been used. The question to one of these witnesses was, 'Is it generally customary, or has it been your experience, to use a block and tackle to unload heavy material from the railroad cars?' The object of this question was to ascertain from the witness whether, in his opinion, a block and tackle might not have been a better appliance with which to unload the tiling than such as was provided for that purpose. An employer is not required to provide machinery

or appliances of any particular kind or description in the conduct of his business, provided the machinery and appliances which he furnishes for the use of his employes are reasonably safe and suitable for the purpose. In such case the inquiry is, not whether better appliances might have been furnished, but whether the defendant is chargeable with negligence in furnishing the machinery and appliances which were used. 'The question,' said Mr. Woods, 'is not whether the master might have provided better machinery, but whether the machinery employed was suitable and proper for the business, that is, whether it was a suitable instrumentality for the business.' Woods on Master and Servant, 332-334.''

*Ford v. Tremont Lumber Co.*, 123 La. 742, 49 So. 492, 22 L. R. A. (N. S.) 917, 131 Am. St. Rep. 370, is an illustration of the application of the rule just stated. In that case, the plaintiff was severely burned when some celluloid checks in the defendant's vault took fire from a match which was used by the defendant's timekeeper in finding his way about the vault. The plaintiff, defendant's stenographer, alleged that the defendant should have employed a safer means of lighting the vault.

From the foregoing we see that a finding of negligence was not necessarily demanded from the fact that the defendant continued to maintain porcelain handles in its hotel after something safer had been devised. A finding of negligence could be warranted only in the event that the evidence shows that a reasonably prudent hotelkeeper, in an endeavor to take due precautions for his guests' safety, would have known that the use of porcelain handles unreasonably subjected his guests to danger and that metal handles were not only available but also safer.

■ The principle which is applicable to the inquiry is thus stated by § 307, Restatement of the Law, Negligence:

"It is negligence to use an instrumentality, whether a human being or thing, which the actor knows or should know to be so incompetent, inappropriate, or defective, that its use involves an unreasonable risk of harm to others."

The question, therefore, occurs: Does the evidence show that the defendant knew or should have known that porcelain handles occasionally injure a user, and that metal handles were not only available but safer. There is no evidence in the record which shows that the defendant's officers had any express knowledge.

We remind ourselves that (1) the handle which injured the plaintiff was, so far as porcelain handles are concerned, of standard make and design; (2) no finding is warranted that it displayed any indications whatever of an impending fracture; (3) there is no evidence that anyone outside of the plumbing industry and those injured by the breakings knew that porcelain handles acted in the manner described by the four aforementioned plumbers; (4) at least one other hotel in Klamath Falls, the Willard, (larger than the defendant's), used porcelain handles; and (5) the plaintiff's brief does not contend that the defendant failed to inspect properly the equipment of its rooms.

From the evidence before us, it is apparent that porcelain handles are in common use. One of the handles is before us as an exhibit. Of itself, it looks harmless. Undoubtedly our hands and those of every adult person have touched hundreds of them. It comes as a shock to be told that we have been so many times unwittingly subjected to danger.

██ We revert to the question: Does the record warrant a finding that the defendant's officers should have known that porcelain handles were dangerous and that metal handles were available. From the comment which follows § 307 of the Restatement, supra, we quote:

"If the work is simple and the danger likely to result from the possible inferiority of the thing is slight, the actor is not required to take any burdensome steps to ascertain its character."

We now quote from § 290 of the Restatement of the Law, Negligence:

"For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is assumed to know

"(a) the qualities and habits of human beings and animals and the qualities, characteristics and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community; * * *."

The following was said by Mr. Justice Holmes in *Commonwealth v. Pierce*, 138 Mass. 165, 52 Am. Rep. 264:

"But knowledge of the dangerous character of a thing is only the equivalent of foresight of the way in which it will act. We admit that, if the thing is generally supposed to be universally harmless, and only a specialist would foresee that in a given case it would do damage, a person who did not foresee it, and who had no warning, would not be held liable for the harm. If men were held answerable for everything they did which was dangerous in fact, they would be held for all their acts from which harm in fact ensued. The use of the thing must be dangerous according to common experience, at least to the extent that there is a manifest and appreciable chance of harm from what is done, in view either of

the actor's knowledge or of his conscious ignorance. * * * But if the dangers are characteristic of the class according to common experience, then he who uses an article of the class upon another cannot escape on the ground that he had less than the common experience."

We are satisfied that the three quotations just made properly state the law. Of course, if the defendant's officers knew that porcelain handles were improper equipment which should have been supplanted with metal handles, then the motion under consideration was properly denied. But the record contains no evidence whatever showing that the defendant's officers possessed any such knowledge. It was, therefore, incumbent upon the plaintiff to prove that the defendant's officers should have known that peril lurked in its porcelain handles and that safer equipment was available. In determining what they should have known, it is proper to assume that they, like all others whose conduct affects the safety of others, would exercise a reasonable degree of deliberation and forethought. But no one is required to possess prophetic ken, and, since the law makes no unreasonable demands, no one is required to guard against that which he can not foresee and which common knowledge does not deem dangerous. In determining whether this defendant should have foreseen that its procelain handles would break, we must disregard what took place July 6, 1940, when the plaintiff was injured, for, as the proverb aptly says, "After the event, even a fool is wise."

The record contains no indication of what common experience teaches concerning the safety of porcelain handles, unless we find it in (1) the testimony of the four plumbers; (2) the fact that the manufacture of porcelain handles was discontinued, or virtually so,

about five years before the trial; and (3) the fact that a large number of the plumbing fixtures in Klamath Falls are equipped with metal handles. There is no direct evidence in the record indicating whether or not people generally knew that porcelain handles occasionally injured people. In fact, the words "common knowledge" and "common experience" were not employed during the trial, and are not present in the briefs.

The testimony of Waters and Dyer falls within the category of expert testimony and was offered as such. Those witnesses spoke of the experience of the plumbing industry, not of common knowledge. The same observations are warranted concerning the manufacturers' discontinuance of the production of porcelain handles. We would be much impressed with the fact that a very large number of the structures in Klamath Falls are equipped with metal handles if we knew that the choice of the handle was made by the owner, and not by the architect, contractor or plumber. Common experience tells us, however, that the owner rarely exercises a choice. Hence, the fact that most of the buildings possess metal handles is nothing more than a repetition of the industry's practice as distinguished from the voice of common experience. As we have already pointed out, even the industry had not formed a practice adverse to porcelain handles until a few years before the plaintiff's injury occurred. Further, the mere fact that metal handles had gained wide favor does not necessarily indicate that those who chose them condemned porcelain handles as unsafe. Price, appearance, availability and the desire for something new may have been the impelling motives.

As previously shown, the record contains no evidence whatever that any owner substituted metal han-

dles for porcelain handles which were in good condition. To the contrary, the evidence indicates that plumbers still replace defective porcelain handles with new ones, and that the plumber who worked upon some of the Willard Hotel's fixtures the day before the trial left the porcelain handles as he found them. We do not believe that the record contains any evidence showing that common experience condemned porcelain handles as dangerous.

■ Since the defendant had no express knowledge that porcelain handles were dangerous, and since the evidence failed to indicate that common experience showed them to be dangerous, the charge made in the complaint that the defendant was negligent was not supported by substantial evidence. The record does not warrant a finding that the defendant should have replaced its porcelain handles with metal ones. It, therefore, follows that the motion for a directed verdict should have been allowed. For that reason, the judgment of the circuit court is reversed.