**CLARK et ux. v. UNITED STATES.**
Civ. 4420.

United States District Court
D. Oregon.

Oct. 23, 1952.

215

Ray G. Brown, Irving Rand, Solon B. Clark, G. J. Meindl and A. C. Allen, Portland, Or., for plaintiffs.

Henry L. Hess, U. S. Atty., Portland, Or., and Walker Lowry, Sp. Asst. to Atty. Gen., of San Francisco, Cal., for the government.

JAMES ALGER FEE, Chief Judge.

On May 30, 1948, when at a flood height of 29.6 feet above mean high water, the Columbia River broke through an embankment and flooded the city of Vanport, which then had a population of approximately sixteen thousand inhabitants. Much personal property was destroyed by the action of the water. Subsequently, more than seven hundred actions for this property damage, comprising some three thousand claims involving several millions of dollars, were filed against the United States for loss and damage to the property under the terms of the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq.

In order that there may be an understanding of the general situation, agreed facts drawn from the pre-trial order, which has elsewhere been printed, are set out.

Peninsula Drainage District No. 1 is a municipal corporation for drainage and flood protection of an area which was bounded by embankments. The north and south dikes were built by the Corps of Engineers, and the western, which had an elevation of 47.3 feet, a crown width of 75 feet and a thickness of 120 feet at the water level, had been built in the period from 1910 to 1918 by two railroad companies for the purpose of carrying trains and not for flood protection. The eastern side was outlined by another embankment topped by a state highway known as Denver Avenue. While the three other sides

in time of flood were pressed upon by the waters of the Columbia River, the latter divided an area of land. All of the land in this Drainage District would have been covered to considerable depth in mean high water if it had not been for the three exterior embankments.

The government had condemned and owned at the time of the flood about eighty per cent of the land in and had purchased and operated the pumping system of this Drainage District. On a portion of this area the city of Vanport was built as a war housing project to accommodate employees of the Kaiser Ship Yards during the war. The Federal Housing Authority, by written document, turned over management of this project to Housing Authority of Portland (hereinafter called "Authority"), a local establishment created by state statute for that purpose. The units had been declared surplus quite a time before the flood and were being rented to any persons who fulfilled requirements set up by Federal Public Housing Administration.

The Columbia River rises in British Columbia and flows 1,210 miles to the Pacific Ocean. It is subject to floods culminating usually in June. In the period from 1858 to 1947, the flow at The Dalles has exceeded 900,000 feet per second in 1862, 1876, 1880 and 1894. The west embankment had withstood the floods of 1933 of a high of 27.7[1] feet; 1928, 27.6 feet; 1921, 27.4 feet; and other floods of less height. These figures were of public record and available to every one. The instant flood of 1948 crested at 32.4 feet after Vanport was flooded. However, the disaster was caused not by the overtopping of the dikes but by the failure of the western embankment.

The flood of May and June, 1948, involved the Columbia River and its tributaries. More than fifty cities and towns were affected. The flood rendered 70,000 people homeless and 5,000 homes were destroyed. More than 400,000 acres were inundated and 41 persons lost their lives. Property damage exceeded one hundred

[1]. All figures are from the Vancouver, Washington, gauge.

million dollars. The flood fight involved 475 miles of levees, protecting approximately 200,000 acres of land. During the flood fight, more than 10,000 persons, including 1,200 army troops, navy personnel, national guard troops and members of the Coast Guard participated.

Public and private agencies actively engaged in the Vanport flood fight or disaster relief were the State of Oregon and its agencies, the County of Multnomah and its agencies, the American National Red Cross, the Housing Authority of Portland, the United States Army Engineers, property owners in the Vanport area and Peninsula Drainage District No. 1, the Sixth Army, and the Coast Guard. The United States Weather Bureau also co-operated in various capacities.

The Army Engineers gave general publicity to the approaching high water, fairly and accurately predicted the height of the water on various days at Portland, and, to the limit of available personnel, furnished technical advice and assistance. The Engineers also maintained a careful and consistent patrol of the areas and dikes involved, including those at Vanport.

The personnel of the railroads, which owned the western fill which failed and operated trains over it, maintained a consistent and careful watch. Three of their employees were inspecting the embankment at the time of failure. The railroads had been subject to government supervision to prevent the stoppage of traffic pursuant to executive order No. 9957, dated May 10, 1948, which was still in effect on May 30.

Authority, by its Project Manager and other executive and administrative employees, managed Vanport in the interests of the Federal Public Housing Administration, which issued directives and had complete control of the policies in effect controlling the renting, financial management, and supposed welfare of the inhabitants. A bulletin was prepared, issued, and distributed to the occupants of Vanport by an executive employee of Authority regarding the situation in the event of a break or overflow of the levees.

No one expected or thought there was a possibility that the western embankment would fail. The Corps of Engineers, engineers of the railroad companies, Authority and all its executives and administrative employees, together with all representatives of the state, community, and national relief organizations, as well as the individuals resident in Vanport, according to their own testimony, believed not only that the western embankment would stand, but that the flood might overtop some other levee.

At approximately 4:30 on Sunday afternoon, May 30, 1948, the west embankment unexpectedly and suddenly broke so rapidly that employees of the Spokane, Portland & Seattle Railway Company, who were inspecting it, were precipitated into the water, where one of them remained for some hours before rescue. The whole area was flooded within an hour. The houses were damaged beyond repair. Personal property of these claimants was destroyed by water damage as a direct result of the break. There were about sixteen thousand persons evacuated safely, and only about fourteen individuals are reputed to have been lost.

This present group of cases relates solely to the loss and damage of personal property of the tenants of Authority.

The cases came on for trial and testimony was taken. Thereafter written briefs were filed. After the briefs had been thoroughly digested, the Court directed that the case be argued orally. At the conclusion of the argument, the cause was taken under submission. An opinion has been filed approving the pre-trial order in the light of the evidence as definitive of the issues of fact and law to be decided.[2]

The plaintiffs set out several well defined theories of recovery which are carried from the pleadings into the pre-trial order. It is claimed that the United States is liable for damage to and loss of the personal property of plaintiffs (a) by failure to control the floodwaters of the Columbia River, (b) in trespass by failure to maintain the dikes, (c) in negligence under the theory

2. Clark v. United States, D.C., 13 F.R.D. 342.

of res ipsa loquitur, (d) in negligence because of the claimed acts and omissions of the agents of the United States, or finally (e) because of the fact that an agency of the United States assumed responsibility for the safety of the personal property of each plaintiff.

In our consideration of the Federal Tort Claims Act, clarity is a necessity. Under our constitutional government, it is a basic postulate that all officers and agents thereof are subject to the rule of law. This heritage comes to us from the principles irrevocably established in the revolt from the Stuart kings. Here a divine right or inherent prerogative is vested neither in administrative bodies nor the executive itself. No man, however highly placed in the federal system, is above the law. A concomitant of this salutary theory is the responsibility of the individual for tortious or illegal acts although done in the scope of authority lawfully conferred upon him and even though he be acting under an express statute. Modernly, personal responsibility of the individual, acting as official or employee, is often a poor protection for a person injured by the tortious act of a governmental employee.

Congress remedied such injustices over a period of years by passing private indemnification bills. But this burden became intolerable. The Tort Claims statute was enacted to set a standard for recovery for persons injured by the acts of persons acting in an official capacity. The United States was to be liable only when and if the individual doing the act would have been liable to the person injured thereby. The statute imposes no new duties upon the government or upon government employees. The statute does not give new remedies to outside persons aggrieved where an official fails to perform his duty to the government.

There are two Fourth Circuit opinions which may be technically justifiable otherwise but which have overtones requiring the United States to respond where a duty required by statute of an official was neglected and an individual injured thereby.

As to the first of these cases, State of Maryland for Use of Pumphrey v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414, 419, where the United States was held liable for the death of a tenant in a housing project by typhus, this implication is found in the sentence, "The answer to the contention is found in the language of Section 2680 itself because in this case the evidence shows that the government was not charged with a discretionary function or duty, but with the absolute duty of keeping the premises safe for the tenants." This idea of an absolute duty running to the tenant seems to color the conclusions that a causal connection had been proven between the condition and the death, that the United States was bound to know that the disease had manifested itself in this housing project and that it was a fact that the disease was communicated only by rats and that the tenant was not required to know of these things or to move out in view of the knowledge that there had been two deaths by typhus in this project. The Court say, 176 F.2d at page 418:

"The Andersons were not entirely free to leave the premises because of the difficulty of obtaining living accommodations in 1946 which the Authority's enterprise on North Calvert Street was designed to alleviate."

This seems to imply that, because the United States erected housing projects, it also insured the safety of the inmates from all causes.

In the Somerset Seafood case, Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, where the United States was held liable for divided damage where damage was caused to a ship which an unfit hand had steered into a wreck which had been marked as dangerous, the implications of this doctrine became more apparent. The question whether a private person who failed to mark a wreck would have been liable under (a) the law of Virginia or (b) the admiralty law to a person who struck the hulk was not debated. At page 635 of 193 F.2d the Court say:

"We think, too, that the Wreck Acts effectively dispose of the contention

that the United States is relieved of liability here because, under § 2680(a) of the Act, the Government is not liable for the breach of a discretionary duty and that the Government's duty here to remove or mark the wreck was discretionary. As we read the Wreck Acts, the duty of the United States to mark or remove the wreck is mandatory."

In the manner in which it was applied, the breach of the mandatory duty required compensation to one who claimed injury as a result of the failure to perform. But the Tort Claims Act was not intended to create new rights in persons claiming injuries.

A succinct and able opinion by Judge Sweeney dissipates this theory. He says that, even though the statutes require the Coast Guard to aid shipwrecked persons and attempt to rescue them, the statute creates no liability against the United States to such persons. The Court there say:

> "It is well settled common law that a mere bystander incurs no liability where he fails to take any action, however negligently or even intentionally, to rescue another in distress. The moving parties urge here that the Coast Guard is charged by statute with the responsibility of saving lives at sea, and a civil tort liability for negligence is thereby created which would be otherwise non-existent. With this I cannot agree. The statute, 14 U.S.C.A. § 1 et seq., invokes a military discipline of rewards and punishments to promote the proper performance of their duties by Coast Guard personnel, but nowhere in the statute is there created a right to be rescued in the sense of an award of civil damages for the negligent failure of the Coast Guard to attempt to rescue a person in distress. It is not for the

Court to create this right where such a novel tort liability is neither contemplated by the basic statute nor recognized by prior law." Lacey v. United States, D.C., 98 F.Supp. 219, 220.

Hence to the various claims and defenses the law of the State of Oregon must be applied. Under the express terms of the federal statute, this Court has exclusive jurisdiction of civil actions for damages against the United States for loss of property caused by the negligent or wrongful act or omission of any employee of the United States within the scope of his office or employment. These actions are within the definition. Recovery can only be allowed under circumstances where the United States, if a private person, would be liable to the particular plaintiff in accordance with the law of the place where the act or omission occurred.[3]

■ The cases from other jurisdictions, even though they arise under the Act, have no pertinency here. This eliminates the decisions cited here relating to the Texas city disaster[4] and the failure properly to mark a ship in the harbor[5] and the tenant who contracted typhus.[6] Here we must apply the law of this state.[7] This necessity highlights the case of Ure v. United States, D.C., 93 F.Supp. 779 and White v. United States,[8] D.C., 93 F.Supp. 779, decided in this Court under the Tort Claims Act, where, based on Oregon law, recovery was allowed claimants for flooding of lands and denied to others for loss of crops by failure of water supply caused by the same series of breaks in an irrigation canal. Under the law of Oregon, there are three prerequisites for recovery against a private person. There must have been (1) a duty incumbent upon the defendant, (2) a breach of that duty by defendant, and (3) injury and damage

3. 28 U.S.C.A. §§ 1346(b), 2674.

4. In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771.

5. Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631.

6. Maryland v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414.

7. 28 U.S.C.A. § 1346(b).

8. The White case was affirmed by the Ct. of App., 9 Cir., 193 F.2d 505.

resulting proximately from the breach of duty.[9]

In the instant situation, the point of existence of duty of the United States is cardinal and must be fixed or the claim wallows without definite direction.[10] The liability of a private person under local law is the compass which will guide the fixation after certain adjustments. The duty which would have rested upon an individual in Oregon upon each of the specific claims made by a plaintiff is the subject of the primary inquiry.

 (a) There is a duty, irrespective of fault or intention, incumbent upon the owner of land who impounds thereon an element, harmless in itself but which has an inherent tendency to break destructively out of bounds, to confine the force within his own boundaries.[11] The accepted canon is a crystalization of the common law actions for vagrant cattle, impounded water and analogous cases. In the restated form, the doctrine is the law of Oregon, but, as was recently pointed out with pertinency, the theory is circumscribed by the limits so set.[12] The striking feature of the doctrine is that the duty is imposed by law. But no such liability is imposed by either statute or decision under the circumstances before us upon a private individual. No private person has responsibility for a natural stream flowing in its own bed, whether in flood or not. Obviously, he cannot be held to have impounded it upon his own property for his own uses and failed to restrain its inherent propensity. No instance of the imposition of absolute liability for natural stream in flood covering property has been cited or discovered.

 A digression must here be made to explain that no duty is imposed upon the United States as sovereign to control a navigable river because of the fact that the water crosses an international boundary and flows through and on the boundaries of different states and carries interstate and foreign commerce.

 (b) The incidents above considered do not fall within the definition of trespass either for the reason that defendant was not voluntarily taking action which resulted in damage. The line between these two theories of liability is close. The distinction between the duty to protect others from the inherent quality of a force passively confined to one's own land and the duty to prevent physical objects which one has set in motion voluntarily from actual invasion of the property of another is perhaps a difference of emphasis. The remedy of trespass would be available, of course, against one who by blasting threw stones upon the land of another, no matter what extraordinary precautions had been taken to prevent their escape.[13] Likewise, one in personal control who drove cattle or impelled water on the land of another would be liable in trespass, notwithstanding precautions taken to prevent such a happening.

The early English law is replete with problems relating to the protection of lands from the flood of natural streams and encroachments of the sea. In the absence of contract, custom or statute, no duty is imposed by common law or by the law of Oregon upon one who erects a dike for flood

9. Todd v. Pacific Railway & Navigation Co., 59 Or. 249, 110 P. 391, 117 P. 300; Chambers v. Everding & Farrell, 71 Or. 521, 136 P. 885, 143 P. 616; Freer v. City of Eugene, 166 Or. 107, 111 P.2d 85.

10. "Actionable negligence must be predicated upon the breach of a legal duty." Freer v. City of Eugene, 166 Or. 107, 111 P.2d 85, 87.

11. Rylands v. Fletcher, L. R., 3 H.L. 330; Tenant v. Goldwin (Eng.), 1 Salk. 360; Suko v. Northwestern Ice Co., 166 Or. 557, 113 P.2d 209.

12. Brown v. Gessler, 191 Or. 503, 512–513; 230 P.2d 541, 23 A.L.R.2d 815.

13. "* * * in the so-called 'blasting' cases an absolute liability, without regard to fault, has uniformly been imposed by the American courts wherever there has been an actual invasion of property by rocks or debris." Exner v. Sherman Power Construction Co., 2 Cir., 54 F.2d 510, 513, 80 A.L.R. 686. For the application of this rule in Oregon, see Salmi v. Columbia & Nehalem Railroad Co., 75 Or. 200, 146 P. 819, L.R.A. 1915D, 834; Fisher v. Burrell, 116 Or. 317, 241 P. 40.

protection of lands which he desires to guard in favor of one who is flooded by a break therein, and flood is a natural force which man cannot control with all his works. Failure to control this destructive force, which is an act of God, does not impose liability upon a private person in the absence of other circumstances. It is true, under certain conditions, an individual might be bound to others to maintain a dike or embankment at all events.[14] If so, such a person might be liable in trespass for damage resulting from a break therein. Likewise, as an interesting Oregon case holds, one who in time of flood releases water from his own dam in the headwaters and thereby accelerates the flow or increases the force of a flood is properly held liable for the damage resulting from his act,[15] but whether in trespass or no we would not debate.

So an attempt has been made by each plaintiff to show that the United States, in some of its manifestations, was under duty to maintain the embankments surrounding Vanport. The ground should be cleared first. Denver Avenue fill broke after Vanport was flooded, so no causal connection between that incident and any property damage here complained of can be established. The Corps of Engineers, an agency of the United States, rebuilt the north and south embankments of Peninsula Drainage District No. 1. These dikes were not under control of the United States at the time of flood, since they had been turned over to the District. But neither of these broke, so no liability can be predicated thereon. The remaining embankment was not constructed, owned or maintained by the United States. This fill had been made by two railroads at various times, not as a water repellent structure, but for the purpose of carrying trains in regular course of operation.

But it is said here the United States was in direct control of the very dike which broke, since this property was owned by two railroads, and these together with all their property had been seized by the government.[16] Such a "seizure" is only a formula whereby labor is given control under government management of an industry in order to prevent strikes in periods of claimed emergency. The executive order, which had for its purpose the continuance of operation of these railroads, when threatened with labor trouble, has no relevance. The "seizure" is a fiction of the flimsiest kind. The ownership and control of the physical properties does not change, but the operating company is put in a situation where the orders of the sovereign regarding labor relations must be obeyed. Specific clauses requiring the individual companies to pay their own losses and damage claims make this clear.[17] In net effect, the federal regulation covering this situation is an executive order which serves the same purpose formerly attained by the issuance of a mandatory injunction of a court requiring continued operation. No duty of the United States to maintain this embankment can be discovered in this record. Therefore, the United States cannot be liable on the theory of trespass.

Closely allied to the two doctrines which have just above been discussed is another theory which developed out of the common law writ of case. Under Oregon law, where a person has complete control of any instrumentality and owes a special duty to a plaintiff, the doctrine of res ipsa loquitur establishes a prima facie case if it is shown that the damage was caused by an

---

14. See Stapleton's Case, Y.B. 29 Edw. III, 32b, in which the plaintiff sued out a writ of trespass against the defendant for damage done to plaintiff's premises by water breaking over, or through, a restraining wall or bank which the defendant was bound by custom to maintain. Street, Foundation of Legal Liability, 182. As to the duty to maintain a dike or seawall, cf. Terrier of Fleet Lincolnshire, London, published for the British Academy by Humphrey Milford, Oxford University Press, Amen Corner, E.C.1920; Callis on Sewers, Reading before Gray's Inn (1622), second edition (1685); United States v. Florea, D.C., 68 F.Supp. 367, 372 ff.

15. Crawford v. Cobbs & Mitchell Co., 121 Or. 628, 253 P. 3, 257 P. 16.

16. Executive Order No. 9957, 13 F.R. 2503.

17. General Order No. 4, dated May 17, 1948, P.T.O., 13 F.R.D. 342.

occurrence which was unexpected and which would not have taken place if there had not been some defect in the instrumentality.[18] The inference can always be rebutted by a showing of due care, accompanied by a rational explanation of the occurrence.[19] General application of this doctrine is found in cases of actions by passengers against a common carrier [20] and by employees against an employer.[21] It also comes into play in situations where an absolute duty to guard a dangerous instrumentality which one has confined on his own land or the duty not to trespass on the lands of another is involved.[22]

It is therefore claimed here that the railroad embankment would not have broken if due care had been used and that it would be incumbent upon a private party to explain the happening and to show that precautions against its occurrence actually were taken. This argument begs the question. The duty of the government is cardinal to the solution. One of the essential factors of the imposition of this burden of explanation under this doctrine is that the United States must have had complete control of the instrumentality.[23] As has been demonstrated above, it had neither ownership, management nor control of this embankment. Nor does the Oregon law place any such duty upon a landlord toward the tenant. The power of the flood waters of the Columbia River, over which the United States had no control, was responsible for the overthrow of a bank apparently adequate but which had evidently been weakened by infiltration of the same water.

In a decision of this Court, "res ipsa loquitur" was used as a possible theory to sustain recovery for damage caused by flooding resulting from breaking of a canal, where the government was in complete control of a column of water and a ditch built on government land high above the watercourse where the water was accustomed to flow.[24] But the Supreme Court of Oregon, while holding that decision correctly stated

---

18. Ure v. United States, D.C., 93 F.Supp. 779; Prosser, Handbook of the Law of Torts, 291 ff. (1941):

19. McPherson v. Oregon Trunk Railway, 165 Or. 1, 102 P.2d 726. The rocks in this case created a hazard very similar to the flood in the instant situation. Also Doherty v. Arcade Hotel, 170 Or. 374, 134 P.2d 118.

20. Budd v. United Carriage Co., 25 Or. 314, 35 P. 660, 27 L.R.A. 279.

21. Though not the law of Oregon and not applicable in the instant situation, in a case arising in the First Circuit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., Jesionowski v. Boston & Maine Railroad, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416, the Supreme Court recently held that exclusive control by an employer railroad is conceptualistic and not a requirement where the accident is unusual and the injured employee has himself participated in the operations. (See note 21 for the Oregon rule.)

22. Suko v. Northwestern Ice & Cold Storage Co., 166 Or. 557, 113 P.2d 209; Laurance v. Tucker, 160 Or. 474, 85 P.2d 374. The Oregon cases cited by plaintiffs which hold a defendant liable for the fall of a bank in a steep sided excavation upon a child, Pate v. Parker, 180 Or. 330, 177 P.2d 250, or for the drowning of a child in water which collected in an abandoned rock quarry with "precipitous steep sides", Wheeler v. City of St. Helens, 153 Or. 610, 58 P.2d 501, 502, or for injuries to a boy from the explosion of a dynamite cap left lying on the ground near where defendant was blasting in a well, Fisher v. Burrell, 116 Or. 317, 241 P. 40, are explicable upon the ground that children who were not trespassers were accustomed to frequent the spot to the knowledge of defendant, who failed to take any precaution to protect them from injury. These are not applicable to the problem before us, since specifically so limited.

23. Ainsworth v. Louisiana & Arkansas Railway Co., D.C., 84 F.Supp. 170; Sipe v. Helgerson, 159 Kan. 290, 153 P.2d 934; Shay v. Parkhurst, 38 Wash.2d 341, 229 P.2d 510. For an analysis of the Oregon cases setting forth the res ipsa loquitur doctrine, see Ure v. United States, D.C., 93 F.Supp. 779, 786 ff. also Ritchie v. Thomas, 190 Or. 95 224 P.2d 543.

24. Ure v. United States, D.C., 93 F.Supp. 779. In Suko v. Northwestern Ice Co., 166 Or. 557, 113 P.2d 209, 212, a tank "in the exclusive possession and control of the defendant" and under its "sole direction" burst and plaintiff was injured as a result thereof. That the floodwaters in the instant situation were in the

the law of the state as to the incorporation of Rylands v. Fletcher, refused to torture these principles in order to allow recovery not covered thereby. Under the circumstances, no duty toward any plaintiff can be spelled out of this situation to explain the happening or to show that due or any precautions were taken.

"Res ipsa loquitur has no application. Hence, no presumption of negligence is created by the mere happening of the accident. Indeed, the law presumes the exercise of due care and it is incumbent upon the party charging negligence to establish it by the greater weight of the evidence. It is also fundamental that negligence can not be predicated upon mere conjecture, guess-work, or speculation. It is not necessary to establish negligence by direct and positive evidence, but there must be facts from which a reasonable inference of negligence may be drawn." Simpson v. Hillman, 163 Or. 357, 97 P.2d 527, 529.

Plaintiffs next urge that the duty to use ordinary care arose from several capacities of the government, (1) as landowner, (2) as seizor of railroads, (3) as employer of the members of the Corps of Engineers, (4) as principal of the Housing Authority of Portland, or (5) as landlord.

 The United States owned eighty per cent of the land in Peninsula Drainage District No. 1 and acquired the pumping equipment thereof. It is said, therefore, that the United States is liable as owner of the land upon which Vanport stood and the buildings erected thereon. Thereby it is said the United States accepted the surrounding embankments as water repellent structures. Since its agents took no care to assure themselves of the composition and structure of the western dike which broke, it is urged negligence was proven. A private landowner who builds structures on his own land, which might be covered in case of flood if it were not for dikes erected, controlled and maintained by other parties, does not insure the embankments against

break for the benefit of any one who may lawfully be on his land or in the structure or a licensee or a tenant. Public policy is satisfied by the fact that the owner risks his own property. The Oregon law imposes no such duty. Likewise, the United States does not guarantee the safety of every person who may lawfully be in a public building in an area liable to flood. Even had the duty existed, there was no proven failure of any person connected with the government to act as a reasonable and prudent person. The cause of the failure of the dike has not been shown. The structure has been explained in detail, together with the character of the ground where it was constructed, the materials used and the method of construction. The Court specifically holds that the fact there were timbers in the fill and that ordinary sand was used therein has not been proven to have had any connection with the break.

 There is no statute nor decision of the courts which holds that a private person or corporation which has built an embankment for its own purposes and not for protection against floodwaters can be held liable for flood damage to some person who, relying on the embankment, built a house or moved in as tenant of another in the shadow thereof. Specifically, the law of Oregon would not make such a private person responsible to such a landowner or tenant. The reason is that no duty attaches.

As has heretofore been explained, the United States was under no duty to any plaintiff by virtue of the control of the management of the railroads. Besides, there was no proof of act or omission of any agent of the United States or employee of the railroads in respect to this dike which constituted negligence. The officers and employees of the railroads, whether under federal control or not, were acting in the light of all available knowledge as to construction of the fill, the materials used and the nature of the underlying ground. As operators of railroads, they acted as to safety of their passengers and freight under

exclusive possession and control of the United States is too ridiculous to be asserted. As has been demonstrated above,

not even the dike which broke was in the possession and control of the United States.

a duty almost absolute, yet trains passed over this fill at the established intervals all during the flood and on the very day of the breakup until half an hour before. Two passenger or freight trains were scheduled to pass just a few minutes later. Inspections were made with meticulous care. Precautions were taken. All the indicia of disaster now pointed up by the event were appraised at the time in the light of their duty to their own passengers and freight and of the knowledge of the nature of the fill. The event proved them wrong, but not negligent. But the United States had no duty whatsoever in relation to the maintenance of the western embankment in time of flood.

The Corps of Engineers is an agency or instrumentality of the United States in its sovereign capacity. No duty to any plaintiff arose from the activities of this body in connection with this flood. The Corps of Engineers have attempted to protect the nation from floods for many decades. Many levees and embankments have been constructed by the army engineers or under their supervision.

 Above and beyond this, claimants marshal a series of facts to establish a duty. It is claimed that the United States Engineers were the leaders of the flood fight and that various regulations had been adopted to govern the conduct of such a contest, and therefore the duty was established to protect any person who might be injured by water.[25] But the engineers are acting simply as firemen do when faced by a widespread calamity. As in innumerable other floods, during this flood also, owing to the high competence of its officers and engineers, and owing to the national consequences, the Corps of Engineers have with-

in the limits of the personnel given technical advice and help in control of the waters not only in the Vanport area, but up and down the Columbia River for a distance of five hundred miles and on Sauvies Island and other islands. The Corps owed no greater duty to plaintiffs, as inhabitants of Vanport, than to any other of the landowners or tenants of private landlords in that great territory. All the acts done and advice given in this situation of widespread peril to the public were honest and competent. They did not attempt to guarantee the safety of the dikes anywhere. No duty was imposed upon the United States by their activities.[26]

However, there is no doubt that Federal Public Housing Administration had complete control of the Vanport operation and had authoritarian domination over the acts and conduct of all employees on that government owned housing establishment from Project Manager to the janitor. A series of the now familiar executive directives controlled in the most meticulous manner the minute detail of financial ownership, operative and managerial functions. Furthermore, by a series of paternalistic pronouncements, the lives, recreation, health and public relations of the tenants were controlled from the central agency in Washington.

The fact that Authority was a federal agency is demonstrated by recent decisions.[27] With reference to the management of Vanport, there is little question that the entity was acting as an agency of the United States, as the Oregon statute empowered it to do. It was true that Authority was an instrumentality of the state government.[28] The members were outstanding citizens,

25. Lacey v. United States, D.C., 98 F. Supp. 219, 220, supra.

26. In the opinion of the Court, no one would have conceived that the United States Engineers or the government, through them, could have been held for this break if the administrative agents of Authority, as soon as the embankment was destroyed and also when that body was faced with suit, had not hysterically attempted to fix the blame on some one— any one but themselves.

27. Toth v. United States, D.C.N.D.Ohio, 107 F.Supp. 37; State of Maryland v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414.

28. Though not in point here, it is to be noted that, in a recent suit against the Housing Authority of Portland, Wickman v. Housing Authority of Portland, Or., 247 P.2d 630, the Supreme Court of the State of Oregon held that the Housing Authority of Portland in the performance of its statutory functions, is carrying

who, in order to perform a patriotic duty, assumed general supervision of a series of housing projects for the public good in time of emergency. No question is raised as to the acts of these individuals who so served or as to the acts of the public body as a whole.

In reviewing the acts of these members, the executive and administrative agents of Authority, there is found no negligence. They carefully inspected the surrounding embankments and themselves took care of weaknesses which showed up or assisted others therein. Watch was kept of the height of the waters on the dikes on all sides. Revetments were made and the height of such embankments increased where it seemed necessary. Furthermore, efficient arrangements were made for evacuation of all persons in the case of necessity. The proof of the care used in this regard is that Vanport was evacuated unexpectedly in a period of about an hour of some sixteen thousand people, with small loss of life.

This brings up the problem of the liability of the United States as landlord, which cannot be divorced from the control over

Authority, which was really acting as project manager.

It is true, here the United States, as landlord, owns the property and rents it to the tenant. But that act contains no guarantee that the property will not be swept away by fire, flood, avalanche, volcanic eruption or earthquake. No private landlord in common sense could guarantee against catastrophe. He certainly is not an insurer.[29]

 The Oregon law is well settled in accordance with common law principle that the landlord has certain definite obligations to the tenant. A private person, as landlord, has no control over leased premises. A separate status is created for the tenant upon a month to month basis. Possession of the particular tenement is in the tenant. The landlord will be liable for damage to the property of a tenant caused by negligence of the landlord as to portions of the property over which he retains control or for negligent maintenance[30] or use of portions of the leased property which he reserves for himself or portions which he allows all tenants to use in common.[31] Furthermore, although the tenant is not pro-

out a governmental function in the protection of the health, morals, safety and general welfare of the public and hence is immune from tort liability. The reason that the government can be sued here because of the act of Authority and its agents is found in the explicit language of the statute. 28 U.S.C.A. §§ 1346(b), 2671, 2674.

29. In Longbotham v. Takeoka, 115 Or. 608, 239 P. 105, 43 A.L.R. 1285, goods of a tenant were injured because landlord allowed the drain upon his part of the premises to become clogged and the rain water invaded the leased premises. This is cited as an example of the absolute liability or trespass theory applied between landlord and tenant. However, the gist of the opinion indicates a want of reasonable care in the cleaning and use of the drain, and the Court 239 P. at page 107 states: "A landlord cannot willfully or negligently burn out or drown out his tenant * * *." Where the landlord has maintained a dangerous condition upon the premises and a tenant or his guests are injured thereby, he is liable. Senner v. Danewolf, 139 Or. 93, 293 P.

599, 6 P.2d 240; Staples v. Senders, 164 Or. 244, 96 P.2d 215, 101 P.2d 232; Lyons v. Lich, 145 Or. 606, 28 P.2d 872. But no such condition upon the premises is proved here. If the landlord agrees to keep the premises in repair, he would be liable for injury resulting proximately from his negligent failure to do so. If the landlord is maintaining a nuisance, he is also liable for any one injured as a result. But the levee here was not on these premises of the United States. It had no responsibility, as shown above, for the dike which broke. A landlord is not liable to a tenant for defects on the demised premises which can be ascertained by the tenant himself "unless they are so hidden that the lessor could be regarded as under an obligation to notify the lessee of their existence." Staples v. Senders, 164 Or. 244, 96 P.2d 215, 101 P.2d 232, 236. Here the danger of flood and of the breaking of the western embankment was as open and apparent to the tenants as to the United States.

30. Longbotham v. Takeoka, supra.

31. Lyons v. Lich, supra.

tected where there are obvious defects and dangers in the property of which he is in possession,[32] the landlord has a duty not to falsely represent concealed sources of danger on the property, whether or not he knows the facts.[33] No case has been cited or found in Oregon or elsewhere which holds the landlord for a break in a dike holding back the flood water of a natural stream, whether the embankment was a part of the demised premises or not.

The tenant has no obligation to lease a particular house in a particular location. If he is attracted by cheap rent, he might consider whether there are other drawbacks. But he might have bought a piece of land and built a house in this vicinity. Then responsibility for and damage to it would depend on other principles. If, instead of buying a house in an exposed localty, he simply leased a house, he would be taking the same risk as tenant of the real property as he would have taken if he had been owner. There was no protection against flood except by taking out a contract of insurance. The insurance companies will write policies against any of such catastrophes enumerated a few paragraphs above.

Again, there was a failure of proof of any breach of duty. The roll of patrols of the dikes, strengthening of embankments, precautions against failure of the surrounding walls, and preparations for evacuation by government employees, especially Vanport employees, negatives any charge of negligence.

██ But it is claimed that there is a doctrine that one who has no duty to act may, by taking action, assume a liability if he fail to accomplish his mission or fail to act efficiently and properly under all the circumstances. The general scope of the doctrine is nebulous and it is subject to extensive limitations equally undefined. How far the theory is accepted by decisions of

the Oregon courts is doubtful. In the field of law relating to landlord and tenant it is specifically held that the landlord who owes no duty to repair by the lease may be held liable for repairs he assumed to make where he neglected the duty thus established or acted negligently to the damage of his tenant or a licensee thereof.[34] But here these opinions do not apply, since repairs on the leased premises are not involved. In this particular relationship, the doctrine has never been applied to other circumstances relating to the tenancy. Whatever may be thought about this, it is certain that no private person could be held beyond the limits of his assumption to act. If it be postulated that these obligations were thus assumed, the nature, character and extent of the obligations must be clearly outlined.

The theory of plaintiffs is that the assumption of duty transcended the narrow limitations of the relation of landlord and tenant. It is claimed that the administrative and executive employees of Authority assumed liability on behalf of the United States for the lives of all persons and safety of all privately owned personal property in Vanport by promising to keep the inhabitants advised of conditions and to warn them in time so that each could protect his property from damage.

The chief criticism which can be directed at this group was that they assumed to be omniscient and radiated an atmosphere of confidence which the situation did not justify. Instead of directing the tenants to do their own thinking and decide on their own what the safety of their families and themselves required, they did indicate that the kind, paternalistic government would take complete direction of its children and protect them.

In this these individuals were not entirely blamable. There was a large file of directives from the national capitol sent to all the housing projects in the country, includ-

32. Stovall v. Newell, 158 Or. 206, 75 P.2d 346; Asheim v. Fahey, 170 Or. 330, 133 P.2d 246, 145 A.L.R. 861.

33. It is to be noted that a landlord who rents premises without a specific representation is not responsible to tenants for harm caused them by defects of which he does not know. Breimhorst v. Beckman, 227 Minn. 409, 35 N.W.2d 719. See also 64 Harv.L.Rev. 917.

34. Staples v. Senders, 164 Or. 244, 96 P. 2d 215, 101 P.2d 232.

ing Vanport, which burningly reflected the same attitude. The thesis seems to be that the people in housing projects are like children; they really do not know what they want or what to believe; if they were adult thinkers, they would wish and desire those things which are best for them; since they do not know what the things which are best for them are, the designated managers of the housing project should accept the challenge and give them guidance and directions, all in accordance with the mandates from above, contained in the housing regulations. However, the ways of Providence are strange. Water does not always follow human dictates, whether those of King Canute or housing authorities.

Based upon the beneficent attitude adopted by the powers, the plaintiffs claim that the United States assumed the responsibility of protecting the property of each of them from damage by water. The basis of the contention legally is the "Good Samaritan" doctrine or the doctrine of contract clause in the leases.

If the bulletin issued by the Housing Authority on Sunday morning be considered, it will be discovered that, in atmosphere, it still radiates protection and light. This is what most persons probably relied upon. But, in making a finding of assumption of duty or contract, the words and the context of the document must be considered. There is here no contract nor guarantee that the river will not flood Vanport. The express language assures safety only at the moment of issue. It does not assure any one that there will be no flood on Tuesday nor on Sunday. In fact, there are very definite promises that there will be a flood and a specific statement of the precautions to be taken to assure the safety of each person in Vanport. If it can be argued that there was a guarantee of personal safety, none of the plaintiffs here has any ground for action

on that score, because these causes of action are based upon damage and loss of property only. The bulletin very positively told each of these plaintiffs that, if a flood came, they would be warned in time to get out themselves, but that they could save no property at all, unless one happened to be on the spot at the time and then he could save only his most valuable possessions and a change of clothing. "Don't attempt to take too much," in the circular, rings the death knell of these claims.[35]

This agency assumed no greater duty than this bulletin sets out. In the cases where property alone was lost, there was no holding out or assumption of duty to give tenants ample time to evacuate his property.[36]

The defenses are:

(1) that the United States owed no duty to any plaintiff in any capacity,

(2) that there was no negligence,

(3) that the officers and agents were acting in a public emergency and that the United States is not responsible for their acts and omissions when so acting in a discretionary field,

(4) that each plaintiff is responsible for the safety of his own property,

(5) that Congress has specifically provided that the United States shall not be liable for flood damage.

As to the first defense, it has been conclusively shown that the United States owed no legal duty as regards any plaintiff in respect to floodwaters. Next, the discussion above also clearly points that, if any duty existed, it was not breached and that the agents of the United States fulfilled every obligation in regard to the property of any plaintiff. Why this dike broke must always be the subject of speculation.

Every one, experts and all, believed that

---

35. As Justice Hay held in Asheim v. Fahey, 170 Or. 330, 133 P.2d 246, 249, 145 A.L.R. 861, so this Court holds: " * * * a landlord may covenant in such stringent terms as to make himself the insurer of the safety of the tenant, but it does not appear to us that this is such a case." It certainly does not appear to us here.

36. For an excellent analysis of the Good Samaritan doctrine, see Prosser on Torts, 194 ff. (1941), and Seavy, Reliance Upon Gratuitous Promises or Other Conduct, 64 Harv.L.Rev. 913. Also see Rest. Torts, § 325.

the western embankment was safe. The railroad engineers and officials who had charge of the original construction and present management of the fill saw no reason to apprehend danger. The fact that it broke does not show that any one was negligent. No care nor precaution could have given notice that any break would occur. There was no absolute duty to maintain the dike or insure it against break. Plaintiffs, who had the burden, proved neither primary duty nor any negligent action nor proximate cause.

The United States further urges that, as far as the flood is concerned, the acts and omissions of all of its agents, instrumentalities or agencies were performed in time of extreme public peril and were governmental and discretionary in character. The Tort Claims Act contains a specific exemption from liability upon claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty".[37]

▆▆▆▆ The law is that each person is responsible for his own property in time of flood, a natural calamity. Whether he is a freeholder or a leaseholder or a tenant at will, the rule is the same. Each of plaintiffs could have found as easily as other persons in the area that the Columbia has from time to time been subject to tremendously high water. These facts were published in newspapers and other publications. This fact has been of national importance. The Court would take judicial notice of this fact as well as of the floods in the Mississippi. It could have been ascertained by any plaintiff as it was a matter of general knowledge that such floods do overtop and break down protective works and dikes. All any plaintiff had to do was to walk less than a quarter of a mile and stand upon one of the embankments and see a wall of water approximately thirty feet high towering over Vanport. When faced with such a

phenomenon, a plaintiff had the option of moving his property or gambling upon the coming events. The fact that any one of them failed to make a proper choice is not a ground for legal liability.[38]

There is no intention to minimize the effect upon these people of this terrific public disaster. The sympathy and help of Portland and surrounding communities went out to the victims thereof, not only in Vanport but for five hundred miles on each side of the Columbia River. The American Red Cross contributed great sums to soften the consequences of this calamity. The agencies of the State of Oregon did yeoman service. Innumerable owners of private homes and buildings in this disaster area were flooded and lost property. It is probable some of them had been in fear of the situation and moved their property and livestock at great expense, whereas the river did not break through the particular dike. In either event, such persons should not be taxed to pay for the common calamity when they have already borne their own loss. These features have no legal significance, but serve to emphasize the fact that the cause must be decided strictly on legal principles. If Congress should see fit to afford further relief, it is submitted that all the flood sufferers should be treated on the same basis, and those of Vanport should not be singled out for exceptional treatment.

▆▆▆▆ Although the Court has with great care examined the alleged bases of recovery against the government and has shown none exists, the Court holds there is an absolute defense available to the United States in the express language, "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or floodwaters at any place".[39] This act is valid, is applicable to the Columbia River, and was not repealed by the Tort Claims Act.[40] It is inconceivable that the government could be held liable for acts

---

37. 28 U.S.C.A. § 2680(a).

38. In Chesapeake & Ohio Railway Co. v. Salyer, 272 Ky. 171, 113 S.W.2d 1152, 1157, 1158, though not controlling here, the Court emphasizes this feature quite succinctly: "It must be presumed that in renting the property, the condition

existing and known to both parties to the contract, the liability to injury by overflow was taken into consideration."

39. 33 U.S.C.A. § 702(c).

40. The Tort Claims Act does not by its terms repeal § 702(c). " * * * re-

done in a purely public capacity to forfend calamity. If a levee built by the government fails, is liability to be imputed? If the engineers change the course of flood-waters from one bank to another to prevent the destruction of a city and the flood incidentally injures others, this act was to prevent liability. The United States for almost a century has supervised the works in the Mississippi Valley under protection of this doctrine. The shield has not been removed.[41]

Findings and judgment in favor of the United States may be submitted in each of the cases to which this opinion may apply.

peals by implication are not favored." Georgia v. Pennsylvania Railway Company, 324 U.S. 439, 456, 65 S.Ct. 716, 726, 89 L.Ed. 1051. Also " * * * later statute, general in its terms and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute." Rodgers v. United States, 185 U.S. 83, 87, 22 S. Ct. 582, 583, 46 L.Ed. 816.

41. 28 U.S.C.A. § 2680(a).